**NATIONAL WILDLIFE FEDERATION, Northern Plains Resource Council, Montana Wildlife Federation, and Powder River Basin Resource Council, Plaintiffs,**

v.

**Robert BURFORD, Director, Bureau of Land Management, Department of the Interior; Donald P. Hodel, Secretary of the Interior, Department of the Interior; and U.S. Department of the Interior, Defendants,**

**and**

**State of Wyoming; Shell Oil Company; and Meadowlark Farms, Inc., Intervenors–Defendants.**

**No. CV–82–117–BLG.**

United States District Court, D. Montana, Billings Division.

Sept. 3, 1985.

James A. Patten, Patten & Renz, Billings, Mont., Thomas M. France, Natural Resource Clinic, Missoula, Mont., Frances M. Green, National Wildlife Federation, Boulder, Colo., Norman L. Dean, National Wildlife Federation, Washington, D.C., for plaintiffs.

Allen McKenzie, Asst. U.S. Atty., Butte, Mont., William M. Cohen, Michael Reed, Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for defendants.

Eugene Gulland, Covington & Burling, Washington, D.C., R.H. Bellingham, Moulton Law Firm, Billings, Mont., for Shell Oil Co.

Richard M. Hall, Washington, D.C., Bruce Toole, Billings, Mont., Steven P. Quarles, Washington, D.C., for State of Wyo.

Christopher Lane, Harold G. Morris, Jr., Sherman & Howard, Denver, Colo., John Ross, Anderson Law Firm, Billings, Mont., for Meadowlark Farms, Inc.

## MEMORANDUM OPINION

BATTIN, Chief Judge.

Plaintiffs, National Wildlife Federation (NWF), Northern Plains Resource Council, Montana Wildlife Federation, and Powder River Basin Resource Council, seek judicial review of final decisions made by the Secretary of the Interior regarding the sale of coal leases in the Powder River coal region located in southeastern Montana and north-

ern Wyoming. In their amended complaint plaintiffs request declaratory and injunctive relief on the basis of the following five counts which allege violations of the Surface Mining Control and Reclamation Act of 1977 (SMCRA), 30 U.S.C. § 1201 et seq., the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1701 et seq., and the Mineral Lands Leasing Act as amended by the Federal Coal Leasing Amendments Act of 1976 (FCLAA), 30 U.S.C. § 181 et seq.:

I. The high bids for the lease tracts do not constitute fair market value;

II. The comprehensive land use plans upon which the sale was based were inadequate because they did not consider a range of resource values in accordance with the principles of multiple use and sustained yield, and they failed to consider important resource values other than coal for private or state owned lands overlying the federal coal.

III. The sale was not compatible with the comprehensive land use plans;

IV. The Secretary failed to review lands for reclamation potential; and

V. The sale of the Cook Mountain and Rocky Butte Tracts was unlawful because the federal defendants changed the bidding procedures applicable to tracts with non-transferable surface owner consents without complying with the rule making provisions of the Administrative Procedure Act.

The federal defendants and the intervening defendants Shell Oil Company and Meadowlark Farms, Inc., move for judgment on all five counts. Plaintiffs move for summary judgment on Counts III, IV, and V only. Also pending before the Court are defendants' motion to dismiss for lack of standing to litigate Counts I and V and various motions relating to discovery. These motions will be addressed in the course of deciding the summary judgment motions.

## FACTUAL AND PROCEDURAL BACKGROUND

In the late 1970's, after nearly a decade of virtual moratorium on federal coal leasing, the Department of the Interior created the Federal Coal Management Program and proposed to lease portions of the extensive federal coal holdings. On April 28, 1982, the Department held the first of a series of lease sales of tracts situated within the Powder River coal region. The Department made available for leasing in this first sale the largest amount of coal ever offered by the government in a single lease sale.

The April sale was preceded by several years of planning under the guidance of Federal Coal Management Program regulations. 43 C.F.R. § 3400 et seq. (1981). These regulations implement the various requirements of several statutory schemes, including FLPMA, SMCRA, and FCLAA, and separate the procedure for leasing and development of federal coal into four somewhat discrete steps: land use planning, activity planning, coal lease sales, and mining. The five counts in plaintiffs' amended complaint focus on the land use planning phase and on the procedure in the lease sale phase for postsale evaluation of high bids to determine if they constitute fair market value and should be accepted.

The goal of land use planning is to identify, out of millions of acres of federal lands, those areas entitled to further consideration for coal leasing. The working document in the land use planning phase for Bureau of Land Management (BLM) lands is the management framework plan (MFP). MFP's were prepared for BLM lands prior to the passage of FLPMA in 1976. The MFP's prepared under pre-FLPMA guidelines will eventually be replaced by more comprehensive "resource management plans" pursuant to § 202 of FLPMA, 43 U.S.C. § 1712. The MFP's make general land use allocations and provide the BLM with a data base from which specific land use decisions may be made. They are the result of cumulated data and analyses prepared by various environmen-

tal specialists. The specialists prepare a set of recommendations for a particular resource and then conflicts between multiple resources are balanced and resolved and the matter is incorporated into the MFP.

Four separate MFP's—three in Montana and one in Wyoming—are pertinent to the tracts offered for lease sale in 1982. The Montana tracts are within areas covered by the 1974 Decker–Birney MFP, the 1975 South Rosebud MFP, and the 1975 Coalwood MFP. The Eastern Powder River Basin MFP, completed in 1977, forms the land use planning basis for the Wyoming tracts.

The adoption, on July 19, 1979, of the regulations implementing the Federal Coal Management Program necessitated changes in the MFP's. As described in greater detail in succeeding sections, the MFP's were supplemented to reflect consultation with affected surface owners and application of criteria to identify lands unsuitable for surface mining as mandated by SMCRA. *See* 30 U.S.C. §§ 1272, 1304(d). Department efforts to amend the Montana MFP's resulted in publication of the July 1979 Powder River Resource Area Management Framework Plan Update Report and a supplement to that report in June 1980. In Wyoming, the state BLM office reviewed two areas within the Eastern Powder River Planning Unit and supplemented the MFP accordingly. A supplement was issued for the Highlight Review Area in March 1980, and the MFP was amended for the Gillette Review Area in June 1980. The MFP's and the various updates and supplements comprised the comprehensive land use plan which provided the basis for activity planning.

Activity planning in the Powder River Basin commenced in April 1980. A region-al production goal and leasing target were set, lease tracts were delineated, and an Environmental Impact Statement (EIS) was prepared to address the environmental impacts of developing those tracts. In 1982, the Powder River Regional Coal Team recommended that 13 coal tracts in both Montana and Wyoming be offered in the first sale. As the notice of sale reflects, the Secretary decided to offer 15 tracts containing nearly 2.24 billion tons of coal by single tract competitive bidding and four additional Montana tracts by intertract bidding procedures.[1] Subsequently, six tracts were withdrawn from the sale, five for lack of evidence of surface owner consent and one because of discrepancies in estimated tonnage. Three of the four tracts to be sold by intertract bidding procedures were withdrawn so the Department decided to offer the remaining tract, Cook Mountain, by single competitive bid.

Bids were received on 11 tracts in Montana and Wyoming containing approximately 1.53 billion tons of recoverable coal reserves. After post sale evaluation to determine whether the bids received constituted fair market value, *see* 43 C.F.R. § 3422.3–4, and whether issuance of a lease to a specific bidder would meet antitrust constraints, nine leases were issued. A tenth lease was issued for the Coal Creek Small Business Set–Aside Tract after review of the lessees' qualifications by the Small Business Administration. The high bid was refused on the 11th tract, Rocky Butte, for failure to meet fair market value. The Rocky Butte tract was offered again along with the Fortin Draw Tract, one of the tracts withdrawn from the April sale, on October 15, 1982. Postsale evaluation of the high bids received for these two tracts utilized new interim procedures published by the Minerals Management Service on September 13, 1982. *See* 47 Fed.Reg. 40243 (1982). The

---

**1.** Intertract bidding is "a lease sale method where tracts containing more reserves in total than the Department intends to lease in that sale are offered for sale, and each bidder competes against other bidders on the same tracts for which he bids and against bidders on the other tracts offered in the same sale." 43 C.R.F. § 3400.0–5(w).

bids were accepted, and these two leases were issued.[2]

The 1982 Powder River coal lease sale has been the subject of a previous opinion by this Court. In *Northern Cheyenne Tribe v. Hodel*, CV–82–116–BLG (D.Mont., May 28, 1985), the Court addressed and agreed with allegations made by the Northern Cheyenne Tribe that the sale of lease tracts in Montana violated federal law which required the Department to identify, consider and, if possible, mitigate the social, economic, and cultural impacts upon the Tribe resulting from the development of these federal coal leases. The Court issued an order addressed only at the Montana tracts which required the Secretary to void the sale, refrain from issuing leases, and rescind any leases that have been issued.

The present lawsuit was filed by plaintiffs one day prior to the sale, on April 27, 1982, in the United States District Court for the District of Columbia. The case was transferred to this Court on June 7, 1982.

### JURISDICTION AND SCOPE OF REVIEW

The matters raised by plaintiffs arise under federal law, and jurisdiction is proper under 28 U.S.C. § 1331. The Court is empowered by 28 U.S.C. § 2201 to issue the requested declaratory relief. Plaintiffs seek review of final decisions of the Secretary of the Department of the Interior pursuant to the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. Section 702, of the APA waives sovereign immunity to suit where a person is "adversely affected or aggrieved by agency action within the meaning of the relevant statute" and seeks relief other than money damages. The Court may hold unlawful and set aside agency action which is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The APA's "arbitrary and capricious" standards limit this Court's scope of review. In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court stated that before a court may overturn an agency decision under this standard,

> the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

2. The tracts leased as a result of the April and October 1982 sales are as follows:

| Tract | Lease | Recoverable Reserves (million tons) | Acreage | Lessee |
|---|---|---|---|---|
| **Montana Tracts** | | | | |
| Colstrip A & B [1] | M–54711 | 58.5 | 1633 | Wn Energy Co. |
| Colstrip C [1] | M–54712 | 18.9 | 893 | " |
| Colstrip D [1] | M–54713 | 43.2 | 2250 | " |
| West Decker [1] | M–54716 | 5 | 40 | MT Roy'ty Co. |
| Coal Creek [2] | M–54710 | 60 | 1033 | Wesco Res. Inc. |
| Cook Mountain [2] | M–54714 | 178 | 2096 | Thermal Energy |
| **Wyoming Tracts** | | | | |
| Little Rawhide Ck [1] | W–78631 | 90 | 530 | Meadowlark Fms |
| So. Duck Nest Ck [2] | W–78629 | 143 | 1154 | " |
| Spring Draw [2] | W–78634 | 323 | 3687 | Shell Oil Co. |
| Keeline [2] | W–78635 | 170 | 3238 | Neil Butte Co. |
| Rocky Butte [2] | W–78633 | 445 | 4856 | Tex. Energy Ser. |
| Fortin Draw | W–78630 | 45 | 320 | |

[1] Production Maintenance Tracts
[2] New Development Tracts

*Id.* at 416, 91 S.Ct. at 823–824 (citations omitted). An agency decision may be reversed only if the agency fails to provide a reasonable basis for its decision. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). Except in rare cases, the Court must confine its review to the full administrative record which was before the agency and on which the agency determination was based. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The court is required, however, to give that record "a thorough, probing, in-depth review." *Citizens to Preserve Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823. The court must accord substantial deference to the agency's interpretation of the statutes and regulations it is charged with administering. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Administrative determinations are presumed to have been made in accordance with law. *See Wilderness Public Rights Fund v. Kleppe,* 608 F.2d 1250, 1254 (9th Cir.1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980). Consequently, plaintiffs bear a heavy burden of proof to show that the Department did not properly discharge its obligations in the process of leasing the subject coal tracts.

## DISCUSSION

### A. *Mootness*

■ This Court's order voiding the Montana leases in *Northern Cheyenne Tribe v. Hodel* raises an issue of mootness as to those portions of plaintiffs' complaint which concern the coal lease tracts situated in Montana. Even though it has not yet been raised by any of the parties, mootness may be raised by the Court since it implicates the Court's jurisdiction. *See St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 537, 98 S.Ct. 2923, 2927, 57 L.Ed.2d 932 (1978).

Analysis of mootness issues generally centers about the remedy sought by plaintiff. *See* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3533. The Court must decide whether there remains any need to decide the merits with respect to the Montana tracts by inquiring whether any effective purpose could still be served by issuing the declaratory and injunctive relief sought by plaintiffs.

Even though the Court, in *Northern Cheyenne,* has granted for different reasons the very remedy that plaintiffs seek here in relation to the Montana leases, there are compelling reasons to decide the merits of this case insofar as the Montana leases are concerned. Various post-judgment proceedings have been instituted since *Northern Cheyenne* was decided on May 28, 1985. The federal defendants and various leaseholders who seek to intervene after judgment have asked the Court to reconsider the remedy granted in *Northern Cheyenne.* There is a possibility, if not a likelihood, of appeal in that case. Consequently, the Court's order has not been acted upon. If the *Northern Cheyenne* decision to void the Montana leases is reversed in whole or in part, any lease reinstated by that action would become immediately subject to the ruling issued and the remedy, if any, granted in the present case. Because the Wyoming leases are unaffected by the *Northern Cheyenne* decision, the merits of this case insofar as they concern the Wyoming leases must be decided anyway. The question of mootness really only affects the extent of the Court's factfinding. Thus, the Court concludes that with respect to the Montana leases there remains a claim which has not lost its character as a present live controversy. *See Connolly v. Pension Benefit Guarantee Corp.,* 673 F.2d 1110, 1113 (9th Cir.1982).

### B. *Standing*

■ As a preliminary matter, federal defendants have filed a motion to dismiss on the ground that plaintiffs lack standing to raise their fair market value claim in Count I. This motion must be denied.

Standing to sue is a threshold requirement which focuses on the parties seeking to invoke federal court jurisdiction and not on the issues that the party wishes to have adjudicated. *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Standing rests both on the Constitution's Article III requirement that judicial power may only be exercised to resolve "cases" or "controversies" and on various prudential considerations intended to promote the efficient allocation of access to scarce judicial resources. *See Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 37, 96 S.Ct. 1917, 1923, 48 L.Ed.2d 450 (1976). The gist of the case or controversy requirement is that a plaintiff must have a sufficient personal interest at stake to assure the Court that the issues raised will be adversely and sharply presented. *See Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). This personal stake exists when the plaintiff has suffered some "actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979), and a " 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978). The case or controversy requirement is satisfied when a plaintiff alleges "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury...." *Id.* at 79, 98 S.Ct. at 2633; *see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

These constitutional standards become applicable to this case through the judicial review provisions of the APA. Plaintiffs challenge the Secretary's determination that the high bids received for the coal leased in the 1982 sale constituted fair market value. Under FCLAA, the Secretary is not empowered to accept bids for federal coal leases unless fair market value for the coal has been received. 30 U.S.C. § 201(a)(1). FCLAA lacks an express judicial review provision, but review is available under § 702 to "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute...." To demonstrate standing under this section, plaintiffs must allege (1) that receipt of less than fair market value could cause them "injury in fact" and (2) that the social, economic, and environmental interests that plaintiffs seek to protect are arguably within the "zone of interests" to be protected or regulated by FCLAA. *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

Injury in fact, the first requirement in this two-pronged test, is the "irreducable constitutional minimum which must be present in every case." *Harrington v. Bush,* 553 F.2d 190, 205 (D.C.Cir.1977). Standing may be had to prevent or redress injury to many types of material interests including economic, aesthetic, conservational, and recreational interests. *See Sierra Club v. Morton,* 405 U.S. 727, 738, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). Injury to a protected interest need only be slight, and it does not matter that many persons will share the same injury so long as the necessary "specific and perceptible harm" is asserted. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).

The federal defendants make two arguments in support of their claim that plaintiffs lack standing to litigate the fair market value claim. First, they argue that plaintiffs have only a generalized-taxpayer concern, one shared equally by all citizens and taxpayers, that the government receive fair market value for its resources. Defendants reason, therefore, that plaintiffs

lack the necessary specific and particularized injury. Second, the federal defendants argue that even if the relief sought by plaintiffs were granted, the environmental injury alleged by plaintiffs would not be redressed. Thus, they claim that there is no causal connection between the environmental injury and the challenged conduct. The federal defendants, however, misunderstand the nature of the injuries plaintiffs' members will sustain if coal tracts are leased for less than fair market value.

Plaintiffs, organizations devoted to conservation, education, the environment, and protection of the agricultural industry in the Powder River region represent themselves and their individual and organizational members. Each plaintiff organization alleges that it has members who live and work on and regularly use those lands within the Powder River region that will be impacted by coal leasing and development. An organization has standing to sue on behalf of its injured members even in absence of injury to itself. *See Warth*, 422 U.S. at 511, 95 S.Ct. at 2211. With respect to all of their claims, plaintiffs allege that they and their members

> actively use the environmental resources of the Powder River Basin for fishing, hunting, bird and wildlife watching, and other recreational activities. These persons will be irreparably injured in their use and enjoyment of these resources if defendants are permitted to conduct the scheduled coal lease sale without fully complying with applicable laws. Individuals affiliated with plaintiffs live, own property, ranch, farm, and earn their livelihoods from lands within the Powder River Basin area. These persons will be irreparably injured in the enjoyment of their property, and in their businesses and their livelihoods, if defendants are permitted to conduct the scheduled coal lease sale without fully complying with applicable laws.

Amended Complaint at 3–4.

Plaintiffs contend that they will sustain direct harm as a result of the defendants' conduct. As an example they cite a section of FCLAA which requires that 50% of all money received from the coal sale be paid to the state in which the individual tracts are located and that in using the money the state legislatures give "priority to those subdivisions of the State socially or economically impacted by development of minerals leased under this Act, for (i) planning, (ii) construction and maintenance of public facilities, and (iii) provision of public service...." 30 U.S.C. § 191. If fair market value is not received for the leases, plaintiffs' members who live in the impacted communities and areas will suffer since a lesser amount of funds will be available to mitigate the impact of coal development. Further, plaintiffs justifiably reason that if fair market value for the coal is not received then the principles of supply and demand predict that lower price will increase demand and result in more tracts being leased. The leasing and subsequent surface mining of more tracts will consequently increase the harmful impacts on plaintiffs' interests. This alleged injury is sufficiently particularized, specific, and perceptible, and there is a fairly traceable causal connection between the injury plaintiffs will sustain and the receipt of less than fair market value for the tracts.

Moreover, the second prong of the standing test under the APA is met because plaintiffs' fair market value claim falls within "the zone of interests to be protected by the statute ... in question." *Association of Data Processing Service Organizations*, 397 U.S. at 153, 90 S.Ct. at 830. Even if the zone test is applied conservatively by looking only to the particular statutory section which frames the substantive issue before the Court rather than to the entire FCLAA statutory scheme, *see Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), it is clear that Congress wished to mitigate the very impacts which plaintiffs allege will result from failure to receive fair market value for federal coal. In the same statutory section which requires receipt of fair market value, Congress also

required the Secretary to engage in comprehensive land use planning and to consider the effects, including environmental and socioeconomic effects, which coal lease development might have on impacted communities or areas. *See* 30 U.S.C. § 201(a)(1), (3)(A)(i), (3)(C). Thus, the interests that plaintiffs allege will be harmed are precisely among those which Congress sought to protect in § 201 of FCLAA. Therefore, plaintiffs allege a sufficient personal stake and interest to assure the concrete adverseness required by Article III and to entitle them to have the Court decide the merits of their claims.

### C. *Count I—Fair Market Value, Discovery Motions*

FCLAA provides that "[n]o bid shall be accepted which is less than the fair market value, as determined by the Secretary, of the coal subject to the lease." 30 U.S.C. § 201(a)(1); *see also* 43 C.F.R. §§ 3422.1, 3422.3–1(b). Plaintiffs allege that the high bids received for the tracts do not even reasonably approximate fair market value. This claim is supported by allegations that some of the bids were below the fair market values determined by the Department's Minerals Management Service, the Department improperly adopted a new entry level bidding procedure, and the entire bidding process was tainted by improper leaks of information which industry representatives subsequently used to influence the outcome of the sale.

Procedurally, all defendants have filed motions for summary judgment on Count I accompanied by detailed briefs which categorically deny plaintiffs' allegations and assert that each high bid met the fair market value test. Plaintiffs resist these motions by simply claiming that the fair market value claims are not ripe for summary judgment because defendants have refused to comply with discovery and because there are many factual disputes with respect to the fair market value claims. Thus, plaintiffs have not filed a substantive response to defendants' summary judgment motions.

Defendants argue that plaintiffs' assertions that material facts are in dispute and that discovery is appropriate are insufficient to forestall a grant of summary judgment in defendants' favor. Ordinarily, the Court would agree that such claims do not preclude summary judgment on the administrative record before the Court. A party cannot resist a properly supported motion for summary judgment by resting on allegations contained in his pleadings. *See First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). But in this case the Court concludes that plaintiffs could have reasonably believed and expected that they would be given an opportunity to brief the merits of their fair market value claim.

Plaintiffs' expectations logically stem from the existence of pending motions to dismiss for lack of standing and to reconsider discovery rulings. Early on in this case the federal defendants moved to dismiss Count I, alleging that plaintiffs lack standing to litigate the claim. At that time the parties agreed to delay substantive briefing of the fair market value claims until a standing ruling. On August 13, 1982, plaintiffs served their first interrogatories and requests for production. Defendants moved for a protective order which was granted by this Court without comment on November 4, 1982. Plaintiffs filed a motion for reconsideration of the Court's order. For reasons not of concern here, neither the standing motion, the motion for reconsideration nor plaintiffs' motion to postpone response to Counts I and II have been ruled upon. Therefore, the Court concludes that it would be inappropriate and unfair to dispose of Count I by summary judgment at this time.

Plaintiffs urge the Court to reconsider its decision granting federal defendants' protective order. They claim that all of the discovery sought is either properly part of the administrative record in the first place or that it will gather material which falls within the narrow exceptions to the general

rule limiting this Court's consideration to the administrative record.

■ Judicial review of agency action under the arbitrary and capricious standard must focus on "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The full administrative record is that which was before the agency at the time the decision being reviewed was made, and it "consists of all documents and materials directly or indirectly considered by agency decisionmakers and includes evidence contrary to the agency's position." *Exxon Corp. v. Department of Energy,* 91 F.R.D. 26, 33 (N.D.Tex.1981) (citations omitted). An agency may not submit an administrative record to the court which contains only documents favoring the agency's decision and omits documents present in the agency's file which bear upon matters before the court. *See Environmental Defense Fund v. Blum,* 458 F.Supp. 650, 661 (D.D. C.1978).

■ In carefully circumscribed instances, a court may require supplementation of the record or allow a party challenging agency action to engage in limited discovery. Supplementation of an administrative record is the exception, not the rule. *See San Luis Obispo Mothers For Peace v. Nuclear Regulatory Commission,* 751 F.2d 1287, 1324 (D.C.Cir.1984). In *Public Power Council v. Johnson,* 674 F.2d 791 (9th Cir.1982), the Ninth Circuit isolated four circumstances where supplementation or discovery may be justified: (1) when the record need be expanded to explain agency action; (2) when the agency has relied upon documents or materials not included in the record; (3) to explain or clarify technical matter involved in the agency action; and (4) where there has been a strong showing in support of a claim of bad faith or im-

proper behavior on the part of agency decisionmakers.[3]

■ About one-half of plaintiffs' first interrogatories directed at the federal defendants, dated August 13, 1982, concern the fair market value claims. Even under the *Johnson* standards, several of these interrogatories exceed the scope of permissible discovery in an administrative review setting. Plaintiffs cite no particular need to expand the administrative record to explain agency action or to explain or clarify technical matters. Some of the interrogatories which arguably pertain to these exceptions are overbroad (*see, e.g.,* Interrogatories 9, 21, 24 and 27). Plaintiffs neither allege nor make any strong showing of bad faith or improper behavior on the part of agency personnel. At best there is only implicit allegation that persons within the department were subject to undue influence by coal industry representatives. Thus, those interrogatories requiring agency personnel to divulge contents of their personal files and notes, material which clearly goes beyond the administrative record, are improper. *See Citizens To Preserve Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825 ("[I]nquiry into the mental processes of administrative decisionmakers is usually to be avoided"). Still other interrogatories ask the Department to disclose all dissention by its personnel relating to a course of action ultimately taken by the Department. Unless such dissention takes the form of reports, memoranda, or other documents actually considered by departmental decisionmakers and used in the course of formulating findings and rationale in favor of or against a decision, allowing such discovery would be ill-advised. In *Mothers For Peace,* the court reasoned that "[i]nclusion in the record of documents recounting deliberations of agency members is especially worrisome because of its potential for dampening candid and collegi-

---

**3.** Some caution must be taken to avoid overstating the breadth of the *Johnson* decision. In *Johnson* the court was reviewing an administrative decision under a statutory scheme which allowed for direct appeal to the circuit court of appeals, and the statutory scheme imposed severe time constraints which required that judicial review be expedited. The court allowed discovery within the limits of these exceptions to proceed but reserved the ultimate determination of what constituted the record until a hearing could be held on the merits.

al exchange between members of multi-head agencies." 751 F.2d at 1326.

■ Although the federal defendants have already filed a voluminous administrative record, certain of plaintiffs' interrogatories seek materials which are properly part of the full administrative record with respect to the fair market value claim and which fall within the second *Johnson* exception. Those interrogatories are set out in the margin.[4] Rather than permitting discovery of these matters, the Court concludes that in this case it would be more expedient and more in keeping with its limited judicial role in reviewing agency action to require that the Department review the record submitted to the Court in light of plaintiffs' pertinent discovery requests and supplement the record accordingly. Because the department's action "must be upheld, if at all, on the basis articulated by the agency itself," *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); *see Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), failure to submit a full administrative record may result in the setting aside of an agency decision because the court must conclude that a decision is arbitrary if it is devoid of explanation or justification in the record.

■ Plaintiffs have also filed motions to compel Shell Oil Co. and Meadowlark Farms, Inc., to respond to discovery. Shell and Meadowlark move for protective orders to quash plaintiffs' interrogatories and request for production of documents. Plaintiffs request that these companies produce all documents which relate in any way to the valuation of the tracts offered in the 1982 Powder River Coal Lease Sale. Without doubt, it would be interesting to compare these valuations with the Secretary's fair market value estimate, but such valuations are clearly outside the administrative record and, at this time, they do not appear to fall within the narrow *Johnson* exceptions. The protective orders must be granted.

In sum, the Court has reviewed defendants' motions for summary judgment on Count I, but it concludes that a ruling on

the merits would be premature. The agency shall be required to review the administrative record it has submitted in light of this opinion, and if appropriate it shall supplement that record. Plaintiffs may also submit additional materials that they deem to be part of the full administrative record. The Court will address any objections to submitted material when it considers the merits of Count I. Because the briefing on the merits of the fair market value claim is insufficient to allow for informed decision-making, plaintiffs shall respond substantively to defendants' motions for summary judgment. Defendants shall be permitted to reply.

### D. *Counts Directed at the Land Use Planning Stage*

Plaintiffs' Counts II and III challenge both the adequacy of the land use planning which forms the basis for the 1982 Powder River sale and the compatibility of the sale with the comprehensive land use plan. To address these counts the Court must first ascertain the extent of the land use planning required of the Secretary under the Federal Coal Management Program, especially during the transition phase between promulgation of the regulations in 1979 and their full implementation.

#### 1. *Land Use Planning in the Transition Phase.*

Land use planning under the coal management program has its source in FCLAA which was enacted in 1976. FCLAA requires that a comprehensive land use plan must be prepared before a lease sale of federal coal deposits can be held. 30 U.S.C. § 201(a)(3)(A)(i). In FCLAA Congress did not expressly define the contents of a comprehensive land use plan except that it did identify two elements which a plan must contain: (1) consultation with appropriate state agencies and local governments and the general public, 30 U.S.C. § 201(a)(3)(A)(ii); and (2) an assessment of the amount of coal deposits. 30 U.S.C. § 201(a)(3)(B).

Two other statutory schemes, FLPMA and SMCRA, contain provisions which affect the content of the comprehensive land use plan. FLPMA, which was passed by

---

**4.** The following August 13, 1982, requests for production seek documentation that, if it exists, would properly be part of the full administrative record with regard to the department's fair market value determinations: 10–18, 28–32, 34–36.

Congress shortly after the enactment of FCLAA, sets out the general land use planning requirements for all lands administered by the BLM. Under FLPMA existing land use plans for federally-managed lands will eventually be replaced by more comprehensive "resource management plans." SMCRA, enacted in 1977, requires the Secretary to "conduct a review of the Federal lands to determine ... whether there are areas on Federal lands which are unsuitable for all or certain types of surface coal mining operations...." 30 U.S.C. § 1272(b). SMCRA also requires the Secretary to consult with surface owners whose land is proposed to be included in a lease tract during land use planning to determine whether the surface owner has a preference for or against the leasing of coal deposits under his land. 30 U.S.C. § 1304(d).

In 1979 the Secretary, in an effort to meet all of these statutory requirements, dovetailed the pertinent portions of these enactments into a land use planning scheme under the federal coal management regulations. *See* 43 C.F.R. §§ 3400 *et seq.* In several instances the Secretary was required to use the power implicitly delegated by Congress to make rules supplying details that were absent in the statutory schemes. *See Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). Except in relation to Count IV, *infra,* the parties do not dispute that the regulations correctly reflect the underlying statutes. Unless a regulation cannot be harmonized with a governing statute, *see Dixon v. United States,* 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223 (1965), it has the force and effect of law. *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Thus, this Court's inquiry into the land use planning phase will focus primarily upon whether or not the Department followed its own regulations as it is required to do. *See United States v. Nixon,* 418 U.S. 683, 695–96, 94 S.Ct. 3090, 3100–01, 41 L.Ed.2d 1039 (1974); *American Motorcycle Assn. v. Watt,* 534 F.Supp. 923, 935 (C.D.Cal.1981), aff'd, 714 F.2d 962 (1983).

The objective and end result of the land use planning phase is to identify those lands which are acceptable for further consideration for leasing in the activity planning phase. 43 C.F.R. § 3420.2-7. The working document in the land use planning phase is a comprehensive land use plan or, in cases of split estate leasing or other instances where the federal interest is diminished, a less complete land use analysis.

When the regulations are fully implemented the starting point for a comprehensive land use plan under the coal management regulations will be a "resource management plan" prepared by the BLM in accordance with FLPMA. *See* 43 U.S.C. § 1712; 43 C.F.R. § 1600 et seq. Generally land use planning under the regulations will entail working within the constraints imposed by the resource management plan and identifying areas within the planning unit that have high or moderate development potential coal deposits. Those coal deposits which could be available for further consideration under the resource management plan will then be subjected to sequential application of screening procedures including (1) unsuitability criteria, (2) site specific multiple use analyses, and (3) surface owner consultation. See 43 C.F.R. 3420.2–3. Lands remaining after screening will be acceptable for further consideration for coal leasing in the activity planning process.

In implementing the Federal Coal Management Program the Department has had numerous start-up considerations. Neither SMCRA, FLPMA, nor FCLAA provided a congressional mandate as to implementation time. Because Congress had not stated otherwise, the Secretary assumed that none of these statutory enactments halted the on-going leasing process during the three to ten-year preparation time for new resource management plans. *See* 44 Fed.Reg. 42584, 42590 (July 19, 1979). Accordingly, he created an interim period which ended on December 31, 1984, to phase in the new regulations.

The land use planning process during the interim period differed from that required now that the regulations are in full effect. Until December 31, 1984, existing management framework plans (MFP's) could provide the basis for the planning process so long as they were supplemented with (1) an unsuitability assessment, (2) the results of surface owner consultation, and (3) an assessment of the amount of coal recoverable by surface and deep mining operations. 43 C.F.R. § 3420.1–5(d). Additionally, the existing MFP had to be evaluated using the FLPMA–derived criteria set forth in 43 C.F.R. § 3420.1–5(c) to determine whether

or not the MFP provided a reasonable basis to proceed to activity planning. *See* 43 C.F.R. § 3420.1–5(d)(4); 44 Fed.Reg. 42584, 42589 (July 19, 1979).

The first of these supplementation requirements, application of unsuitability criteria, is a product of SMCRA. 30 U.S.C. § 1272(b). Section 1272(b) does not specify when in the development of federal coal tracts the unsuitability assessment under the federal lands review is to be completed, although the preceding subsection, § 1272(a)(5), provides that unsuitability determinations "shall be integrated as closely as possible with present and future land use planning and regulation processes...." The Department initially proposed to apply all unsuitability criteria at the mine plan stage, but the Secretary chose instead to apply the majority of the criteria in the land use planning phase, and this decision is reflected in the regulations. *See* Secretarial Issue Document, Federal Coal Management Program, Vol. I, p. 47 (Admin.Rec. at 1); 43 C.F.R. §§ 3420.1–1, 3461.3.[5] Certain unsuitability determinations, however, such as reclaimability and location of alluvial valley floors were left to later phases of coal lease development because the gathering of the necessary data to assess such unsuitability at an early stage would require excessive manpower and funding.

The regulations also require that existing MFP's be supplemented with the results of surface owner consultations and with an assessment of coal recoverable by surface

and deep mining operations. The surface owner consultation is an attempt to determine whether or not the qualified surface owners in the potential lease areas have a preference for or against surface coal mining. *See* 43 C.F.R. 3420.2–3(e)(1). If there is significant surface owner opposition, an area is eliminated from further consideration for surface mining unless it becomes necessary to issue leases in that area to meet the regional leasing target. 43 C.F.R. § 3420.2–3(e)(2). Generally, the assessment comparing the amount of coal mineable by surface or underground methods is of lesser importance in the Powder River region because most of the coal is mineable economically only by surface methods.

 Finally, as stated earlier, the regulations require that an existing MFP be evaluated under the FLPMA and FCLAA-derived criteria set forth in 43 C.F.R. § 3420.1–5(c) to determine whether or not the existing land use plan forms a reasonable basis for proceeding to activity planning.[6] Shell, MFI, and Wyoming argue that there are no FLPMA-related planning obligations in the land use planning process until December 31, 1984, and thus they reason that no such obligations existed for the land use plans which formed the basis for the 1982 coal lease sale. They contend that the existing MFP's needed only to be supplemented by application of the unsuitability criteria and surface owner consultation. These parties misconstrue the regulations.

---

5. The Secretary chose to apply the unsuitability criteria during land use planning for the following reasons:

> To provide greater predictability for all interested parties in the coal management program, to ensure that lands which clear should not be mined are excluded from leasing consideration as promptly as possible, and to avoid the costly situation for both a coal company and the Federal government of taking a tract all the way through lease sale and mine plan *development only to find that it is either* unmineable or would require such restrictive stipulations in the mine plan or mining permit as to make mining uneconomic.

Secretarial Issue Document, Federal Coal Management Program, Vol. I, pp. 47–48.

6. 43 C.F.R. § 3420.1–5(c) provides that:

> (c) In order to qualify as the basis for issuing a lease, the comprehensive land use plan or land use analysis shall have:
>
> (1) Considered a range of present and potential resource values and uses in accordance

with the principles of multiple use and sustained yield.

(2) Used necessary professional disciplines in the analysis of resource development proposals;

(3) Identified critical environmental areas, if any;

(4) Reflected available, relevant data commensurate with anticipated conflicts in values and potential uses, and with likely levels and impacts of such uses;

(5) Developed and analyzed alternative proposals for multiple resource development and use;

(6) Analyzed the significance of values that would be affected by proposed actions in terms of local, regional and national prespectives, consistent with agency directives; and

(7) Been formulated in consultation with appropriate state and local governments and agencies and with the opportunity for public participation, including a public hearing if requested by an adversely affected party.

When formulating the land use planning requirements for coal sales held before completion of resource management plans, the Department was concerned that the existing land use plans would not withstand judicial scrutiny. Various environmental groups, including plaintiffs, had warned the Department that mere application of unsuitable criteria and consultation with surface owners, as had been proposed in earlier versions of the regulations, would not cure defects in the plans. *See* Issue Paper 16, Secretarial Issue Document, Federal Coal Management Program, Vol. I, p. 188. The Department responded to these concerns in two ways. First, it adopted the interim period ending on December 31, 1984, after which only resource management plans or land use analyses prepared under FLPMA guidelines could provide the basis for activity planning. *See* 43 C.F.R. § 3420.1–5(e). This cutoff date was set to evidence the BLM's commitment to timely preparation of resource management plans in coal areas. Second, the Department borrowed criteria primarily from § 202(c) of FLPMA, 43 U.S.C. § 1712(c), and from FCLAA, 30 U.S.C. § 201(a)(3)(A)(ii), to determine the adequacy of the existing MFP's. Issue Paper 16 at 189–90; 43 C.F.R. § 3420.1–5(c). Thus, contrary to the intervening defendants' contentions, the Department opted to evaluate existing MFP's during the interim period using several FLPMA standards and was therefore bound by regulation to do so. *See also* 43 U.S.C. § 1712(d) (land use plans existing on the effective date of FLPMA are subject to review under FLPMA).

■ Wyoming, Shell, and MFI also question the extent to which land use planning is to be applied to lease tracts where the sole federal interest in the land is in the mineral estate. Citing *Columbia Basin Land Protection Assn. v. Schlesinger*, 643 F.2d 585, 601–02 (9th Cir.1981), they argue that tracts which consist of non-federal surface need not be considered in a FLPMA land use plan. They also make the argument which the Court has already dispelled that land use planning requirements imposed by the federal coal management program regulations are inapplicable until after December 31, 1984. Relying on these arguments, Wyoming reasons that the only land use planning prequisites to leasing must "spring directly" from FCLAA, and it cites a congressional report which predates both FLPMA and SMCRA for the proposi-

tion that FCLAA requires the Secretary to perform only a "simple land use analysis" on tracts with non-federal surface and that there is no planning obligation for non-federal interests not included in the lease tract. Defendants' contentions are incorrect.

The regulations applicable in 1982 clearly spell out the Secretary's land use planning obligations in split estate leasing situations:

> The Secretary may lease in an area where it is found either that there is no Federal interest in the surface or that the coal deposits in an area are insufficient to justify the costs of a Federal land use plan if: (i) the lands have been included in a comprehensive land use plan prepared, authorized or recognized by the state in which the lands are located....; or (ii) the Secretary has completed, in accordance with the standards in paragraph (c) of this section or in accordance with Group 1600 of this title, a land use analysis.

43 C.F.R. § 3420.1–5(b)(3); *see* 30 U.S.C. § 201(a)(3)(A)(i). The administrative record does not reflect that either Wyoming or Montana has prepared, authorized, or recognized a comprehensive land use plan for those state lands containing federal coal deposits. Nor does it appear that the Secretary completed a land use analysis pursuant to 43 C.F.R. § 1601.6–4. Instead, the Secretary has chosen to use MFP's developed for larger land use planning units which can provide the planning basis for several lease tracts at once and which can balance and coordinate the coal resource with other federal resources existing in the planning unit.

Numerous land use planning obligations exist when federal coal is developed regardless of surface ownership. The SMCRA unsuitability criteria must be applied on lease tracts having non-federal surface. The Secretary must review the federal lands to determine which are unsuitable for surface coal mining. 30 U.S.C. § 1272(b). "Federal lands" under SMCRA "means any lands, *including mineral interests,* owned by the United States...." 30 U.S.C. § 1291(4) (emphasis added). Moreover, unless he relies upon a state's comprehensive land use plan, the Secretary, regardless of whether he relies upon an existing MPF or a land use analysis, must apply those FLPMA planning guide-

lines set out in 43 C.F.R. § 3421–5(c) when leasing federal coal on non-federal surface. *See* 3420.1–5(b)(3)(ii) (land use analyses must be completed "in accordance with the standards in paragraph (c). . . ."); 3420.1–5(c).

The Court concludes that for the existing land use plans (MFPs) to qualify as comprehensive land use plans during the transition period, they must have been evaluated under and be in substantial conformance with the criteria set forth in 43 C.F.R. § 3420.1–5(c), and they must be supplemented by an unsuitability assessment, results of surface owner consultation, and an assessment of the amount of recoverable coal pursuant to 43 C.F.R. § 3420.1–5(d). Because the Secretary did not choose to rely on a state's comprehensive plan, these planning requirements apply to all lands overlying federal coal regardless of surface ownership.

2. *Count II—Adequacy of the Land Use Plans.*

 Plaintiffs' Count II alleges that the land use plans providing the basis for the Powder River coal sale were inadequate because they (1) failed to consider important resource values other than coal for private or state-owned lands overlying the federal coal and (2) failed to take into account the resource value of agriculture in the region. Plaintiffs further allege that a lease sale based upon such an inadequate plan violates FLPMA, FCLAA, and regulations implementing these statutes.

Count II is presently in the same posture as Count I. Plaintiffs have not yet had an opportunity to brief the merits of their claim that the land use plans are inadequate. For the same reasons set forth with respect to Count I, the Court shall defer ruling on Count II and again require the appropriate supplementation[7] and briefing. In accordance with their heavy burden of proof, it is plaintiffs' obligation to point out, with specificity, the inadequacies, if any, in the land use plan that entitle them to the remedy they seek. The Court will not sift through the record and search out specific inadequacies on the basis of generalized allegations made by plaintiffs that are not supported by references to the record.

3. *Count III—Compatibility With The Land Use Plan.*

In their Count III, plaintiffs allege that the lease sale of three Wyoming tracts and all six Montana tracts violated the provision of FCLAA requiring coal lease sales to be compatible with the comprehensive land use plans for the lands containing the coal deposits. 30 U.S.C. § 201(a)(3)(A)(i); 43 C.F.R. § 3420.1–5(a). Incompatibility is alleged to exist for each of the lease tracts for one or more of the following reasons:

1. The tract improperly includes acreage which was eliminated from further consideration for leasing after application of the SMCRA unsuitability criteria;

2. Unsuitability criteria were not applied to some of the areas contained in the tract;

3. Acreage was included in the tract which was outside areas designated earlier in the comprehensive land use plan (MFP) as available for possible future coal leasing; and

4. The tract improperly contained area which had been excluded previously because of surface owner opposition to coal leasing.

Plaintiffs support their claims factually by submitted two affidavits prepared by their expert, Russell Boulding, who classified acreage on each of the tracts into the above four categories after examination of the land use planning record available to the public. Plaintiffs claim that this incompatibility justifies voiding the sale and rescinding the nine leases. Before they challenge Bouldings' factual claims, defendants raise several preliminary legal arguments.

 Wyoming claims that federal coal leasing does not have to be compatible with "early planning documents," such as the MFP's, but need only be compatible with a "final land use plan" as constituted prior to the sale which includes activity planning documents (i.e. tract profiles, regional sale EIS). Wyoming misunderstands the basic land use planning scheme. The lease sale must be compatible with the "comprehensive land use plan" which is the early planning document, in this case the appropriate MFP and MFP update, that provides the basis for ascertaining which areas within

---

7. The following August 13, 1982, requests for production seek documentation that, if it exists, would properly be part of the full administrative record with regard to adequacy of the existing land use plans: 42, 44–47, 50–52.

the planning unit are acceptable for further consideration for leasing. *See* 43 C.F.R. 3420.2–7 [8].

■ Wyoming also argues that any claim by plaintiffs that defendants failed to either make or heed SMCRA-based unsuitability determinations is not cognizable under the FCLAA statute which requires that the sale be compatible with the land use plan. Wyoming asserts that SMCRA claims become ripe only prior to actual mining while the FCLAA creates obligations prior to the lease sale. It concludes that plaintiffs are using a "hybrid claim" in an attempt to advance the SMCRA timetable.

Again, Wyoming's position is clearly refuted by the regulations adopted by the Secretary. The regulations require that the unsuitability criteria be initially applied during land use planning. 43 C.F.R. § 3461.4–1(b)(2). This initial documentation of unsuitability has expressly been made part of the comprehensive land use plan, the document with which the sale must be compatible, both during (by supplementation) and after the interim period. *See* 43 C.F.R. §§ 3420.1–5(b)(1), 3420.2–3(c), 3461.3–1(a)(1). The Court now turns to evaluation of plaintiffs' claims regarding specific tracts.

### a. *Montana Tracts.*

■ Plaintiffs assert that the Coal Creek Small Business tract wrongfully includes almost 300 acres that had been excluded in the 1979 MFP update due to surface owner opposition. During the process of preparing the MFP update all surface owners in the affected area were consulted as required. *See* 30 U.S.C. § 1304(d); 43 C.F.R. § 3420.1–5(d)(2). The federal defendants agree that a negative response was received from one surface owner for nearly 300 acres in the Coal Creek tract. When the BLM was informed, however, that the same surface owner had signed a surface owner consent agreement with Wesco Resources, Inc., on December 13, 1976, it corrected its consultation findings to indicate that the surface owner had expressed a preference in favor of mining. The BLM's action is in accord with the regulations which provide that "any surface owner who has previously granted written consent to any party to mine by other than underground mining techniques shall be deemed to have expressed a preference in favor of mining." 43 C.F.R. § 3420.2–3(e)(2).

■ In his affidavit, Russell Boulding states that 370 acres of the Coal Creek tract and 240 acres of the Cook Mountain tract were deemed unsuitable for surface mining after application of unsuitability criterion 15. Criterion 15, 43 C.F.R. § 3461.1(*o*)(1), designates unsuitable "fish and wildlife habitat for resident species of high interest to the state and which are essential for maintaining these priority wildlife." Unsuitability review of lands within these tracts disclosed the presence of sharp-tailed grouse leks. The regulations provide that "[a] lease may be issued if, after consultation with the state, the surface management agency determines that all or certain stipulated methods of coal mining will not have a significant long-term impact on the species being protected." *Id.* The record indicates that the BLM engaged in such consultation with the Montana Department of Fish, Wildlife and Parks, *see e.g.*, Admin.Rec. at 249, 288, and, as a result, stipulations were included in both the Coal Creek and Cook Mountain leases that require an agreement to be reached with the Department of State Lands before mining can take place "to assure that there will be no significant long-term negative impact on the sharp-tailed grouse and their habitat...." *See, e.g.,* Coal Creek Lease, M 54710, § 31(d) (Admin.Rec. 440).

■ The final claim made by plaintiffs concerning incompatibility on Montana tracts implicates all six tracts. For each tract plaintiffs claim that certain acreage, ranging from 4% to 75% of the tract's total acreage, lies outside the boundaries of federal coal identified in the comprehensive

---

**8.** Wyoming's position would turn this orderly program on end by allowing tract profiles and NEPA documents to serve as the sole vehicles for multiple resource balancing and unsuitability review documentation. At this point in the process, after tracts have already been delineated, such analysis may result in a sale which is "compatible" with land use decisions, but the tract may not be the most desirable to develop from a regional standpoint. The land use planning scheme avoids this pitfall by assessing resource trade-offs and applying unsuitability criteria throughout the planning unit before identifying areas potentially acceptable for coal development.

land use plan as acceptable for further consideration for leasing. The federal defendants concede that plaintiffs' factual claim is true, but they attribute the acreage discrepancies to "squaring off" of the tracts to aid in description of the lease by smallest legal subdivision. Further, federal defendants assert by citation to the administrative record and through the affidavit of Richard A. Zander, a supervisory natural resource specialist for the BLM, that certain unsuitability criteria were applied beyond the coal boundary when it was ascertained that an unsuitable area lying beyond the boundary could render lands unsuitable within the boundary because of buffer zone requirements.

The reason for the acreage discrepancies is readily apparent when maps of the tract areas are viewed. The early MFP's identified lease recommendation areas (LRA's) after multiple resource trade-offs were made. The LRA's are amoeba-shaped areas which correspond to an earlier geological location of strippable federal coal outcrops. They are not amenable to description by legal subdivision as is required in federal coal leases. 43 C.F.R. § 3471.1–2. Multiple resource balancing in the MFP's and unsuitability assessment were confined (except as noted above) within the LRA boundary. *See, e.g.,* Powder River Resource Area Management Framework Plan Amendments, Admin. Rec. 16. The Department squared off these boundaries outward by incorporating all of the smallest legal subdivisions into a tract which included any portion of the previously-existing LRA.[9] Consequently, those lands within the smallest legal subdivisions that were included in the lease tract but were outside the boundary of the LRA were not recommended by the comprehensive land use plans for further consideration for leasing. The acreage discrepancy is particularly acute in small tracts. For example, "squaring off" added 75% of the West Decker Tract's total acreage (40 acres).

The Department's inclusion in the process of "squaring off" lease tracts of acreage not recommended by the land use plan for further consideration for leasing is inconsistent with the structure of the regulations, *see, e.g.,* 43 C.F.R. §§ 3420.2–7, 3420.-4–1(a), but the Court cannot, under the circumstances, conclude that this inconsistency renders the sale of the lease tracts incompatible with the comprehensive land use plans. The MFP's predate the coal management regulations by years, and considering the different methodology and objectives sought in those plans, it is unreasonable to expect that they will incorporate as precisely into the coal management program's regulatory scheme as will the new FLPMA resource management plans. It is obvious that the BLM could not have intended the erratically-shaped LRA boundaries to become the eventual boundaries of a lease tract. The MFP's merely described areas containing strippable coal outcrops, around which lease tracts could be situated. Each Montana tract is, in fact, situated about a coal outcrop which had been recommended for leasing in the MFP's.

b. *Wyoming Tracts.*

 Plaintiffs' first claim with respect to the Wyoming tracts is based on research by Russell Boulding which indicated that large portions of the Spring Draw, Little Rawhide Creek, and Duck Nest Creek Tracts lie outside areas which were identified for possible future coal leasing in the 1977 Eastern Powder River MFP map. The Court concludes that Boulding's finding is not significant with respect to compatibility.

Compatibility of the 1982 lease sale must be assessed not only against the MFP but also against the MFP updates. In the 1980 amendment to Wyoming land use decisions, for example, a decision was made to lift certain socioeconomic and resource conflict constraints that had influenced decisions made in the earlier MFP. Consequently, additional area became acceptable for possible coal development. Maps accompanying the March 1980 supplement to Wyoming land use decisions (Highlight Review Area) and the June 1980 amendment to Wyoming land use decisions (Gillette Review Area) confirm that all three lease tracts fall within areas acceptable for further consideration for coal leasing or areas acceptable pending further study.

---

**9.** Regulations indicate that the BLM could have squared off the tracts to 10–acre rather than 40–acre subdivisions. 43 C.F.R. § 3471.1–2(a) states that "the lease when issued shall be described by legal subdivision (section, township, and range), or aliquot part thereof (*but no less than 10 acres*)." (emphasis added). The Court concludes, however, that this discrepancy does not affect the Court's analysis with respect to compatibility.

■ Plaintiffs also contest the inclusion into the Spring Draw and Little Rawhide Creek tracts of lands that had been eliminated under Criterion 3 during the unsuitability assessment. Criterion 3, 43 C.F.R. § 3461.1(c), provides that 100 to 300 foot buffer zones around roads, parks, cemeteries, public buildings, dwellings, and the like are unsuitable for mining. Portions of Wyoming state highways extend through both the Spring Draw and Little Rawhide Creek tracts. Lands within 100 feet of these roads are unsuitable for surface coal mining.

Although exceptions exist which will allow mining of these lands, the Department elected not to apply them. Instead, the BLM and the lessees agreed upon stipulations intended to protect the 100 foot buffer zone. Wyoming State Highway 14–16 passes through the western portion of the Spring Draw tract. Shell has agreed to the addition of a stipulation in its lease protecting the 100 foot buffer zone. Further, the administrative record and the Spring Draw tract profile indicate that a portion of this highway will eventually be relocated. The Little Rawhide lease, W–78631, contains a stipulation in § 31(d) prohibiting mining or surface occupation within 100 feet of State Highway 14–16 and providing for relocation of State Highway 59 pursuant to the directions of the Wyoming State Highway Department. It is within the authority and discretion of the Department to enter into lease stipulations to limit surface coal mining operations on areas that have been designated unsuitable. *See* 30 U.S.C. § 1272(b); 43 C.F.R. § 3461.3–1(a)(1). Thus, plaintiffs' claims of incompatibility resulting from inclusion of these buffer zones must fail.

■ The Little Rawhide Creek tract is also the focus of another of plaintiffs' claims. The actual tract leased contains slightly more acreage than was considered at the tract profile stage. Plaintiffs argue that the acreage added, approximately 39 acres, was not recommended for coal leasing in the comprehensive land use plan. In the tract profile the western boundary of the tract parallel State Highway 14–16 which runs diagonally from northwest to southeast, just west of the lease tract. The angled boundary was squared off for description by legal subdivision in Lease W–78631. The Court does not agree with plaintiffs that mere failure to include this 39 acres in the tract profile disqualifies the Department from including it in the lease to make relatively minor boundary adjustments. All 39 acres lie within the high and moderate potential coal boundary. The unsuitability criteria were applied to this acreage, and in the MFP and updates the acreage, with the exception of the 100 foot buffer zone, was recommended for further leasing. Very little of this 39 acre addition actually falls within the 100 foot buffer zone, and that which does is protected by lease stipulation.

■ The final two compatibility violations alleged by plaintiffs both concern Shell's Spring Draw tract. The first relates to a prehistoric site which was identified in the site specific inventory conducted during preparation of the tract profile. Plaintiffs allege that the tract profile improperly concludes that unsuitability Criterion 7, 43 C.F.R. § 3461(g), which protects sites of historic, architectural, archeological, or cultural significance, is not applicable to the tract, that there is no evidence that the BLM consulted with the Advisory Council on Historic Preservation or the State Historic Officer on whether mining will adversely affect the site, and that there is no protective stipulation in the lease. The administrative record, however, reflects that considerable attention was given to the protection of the site. Although the site is not listed in the unsuitable appendix of the tract profile under Criterion 7, a separate appendix recognizes that before development may take place a decision must be made, after mandatory consultation with the Advisory Council on Historic Preservation, as to how this site is to be treated. Further, § 31(a) of the Spring Draw lease requires a "cultural resource intensive field inventory," forbids activities which could disturb cultural resources absent specific approval, and requires that the lessee "protect all cultural resources within the lease area from lease-related activities until the cultural resource mitigation measures can be implemented as part of an approved mining and reclamation plan...." The Court concludes that plaintiffs' concerns with respect to the prehistoric site have been amply addressed by the federal defendants and Shell.

■ Finally, plaintiffs contend that the Spring Draw tract is incompatible with the comprehensive land use plan because approximately 680 acres in the eastern portion of the tract are outside the area where

unsuitability criteria were applied and thus were not determined acceptable for further consideration for coal leasing.

The affidavit of Glenn Bessinger who supervised the application of the unsuitability criteria to the Gillette review area states that the unsuitability criteria were fully applied to all lands within the review area. This statement is not corroborated by the administrative record made available to the public or to the Court. The proposed amendment to Wyoming Land Use Decisions, Eastern Powder River Basin Area (Admin.Rec. 5 at p. 10), and the maps accompanying this document indicate that the criteria were applied only to 137,200 acres of the 292,000 acre review area remaining after acreage was eliminated because it was outside the area of high and moderate potential for coal development or was subject to various planning constraints. The 680 acres in contention lies outside the high and moderate potential for coal development boundary, and thus it is outside the area where the unsuitability criteria were applied. *See also* Admin.Rec. 15, pp. 3 and 8. The Court cannot accept *post hoc* statements made in affidavits that are not grounded in the administrative record. *See Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). Thus, the Court concludes for the purposes of this case that the unsuitability criteria were not applied to the 680 acre tract.[10]

The Spring Draw tract profile indicates that very little, if any, of the 680 acres will be mined. The land will be used for mine facilities and for access roads to the mining area. A prairie dog community, situated on approximately 40 of the 680 acres, raised concerns that habitat for the endangered black-footed ferret may be disturbed, but no ferrets have been sighted on the tract. The Shell lease contains a special stipulation requiring field searches to be conducted as directed by the United States Fish & Wildlife Service for evidence of the presence of black-footed ferrets. Any discovery of black-footed ferrets must be brought to the United States Fish & Wildlife Services' attention for formal direction.

No other unsuitability criteria apply to the 680 acre portion, and plaintiffs have not identified other resource conflicts on this acreage.

Having balanced all these factors, the Court concludes that sale of the Spring Draw lease tract, including the 680 acres in contention, was not incompatible with the land use plan. As discussed earlier, the June 1980 amendment to Wyoming land use decisions (Admin.Rec. 15) designated the entire Spring Draw tract acreage either acceptable for further consideration for surface mining or acceptable pending further study. The unsuitability criteria were applied during land use planning to the acreage on the tract from which coal was to be extracted. The criteria were fully applied to the entire tract during preparation of the tract profile.

Ideally, the unsuitability criteria should have been applied fully to the 680 acre portion in the land use planning phase. Failure to do so was inconsistent with the regulatory scheme, but this inconsistency does not necessarily imply that the sale of the tract was incompatible with the comprehensive land use plan. The Federal Coal Management Program's planning scheme can be fairly described as a step-by-step process which is reductive in terms of acreage made available for federal coal leasing. Up to millions of acres of land are eligible for consideration at the outset of land use planning. Application of multiple use/sustained yield analysis, environmental analyses and other planning tools reduce the available acreage considerably. Identification of areas of high to moderate potential coal deposits, application of the unsuitability criteria, and consultation with surface owners reduce the acreage even more. Site specific analyses during the activity planning stage may further narrow the choices of sites available for leasing. The lease sale of a tract which has not been subjected to this analysis in the manner and sequence outlined in the regulations defeats the purpose of this planning scheme and is incompatible with the underlying comprehensive land use plan.

This is not to say, however, that the addition of relatively small amounts of land to tracts which have otherwise run the

---

**10.** Even if the unsuitability criteria were applied to the entire Gillette review area as Bessinger states, the BLM violated the regulations by not providing notice and making public the results of the application of the unsuitability criteria outside the high and moderate potential boundaries. *See* 43 C.F.R. §§ 3420.1–5(d)(iv), 3461.3–1(a)(2).

gamut of land use planning analyses renders the entire tract incompatible with the comprehensive land use plan. It is reasonable and within the discretion of the Department to include relatively small portions of land in a tract to facilitate legal description of the tract, as was the case with the Montana tracts and the Little Rawhide tract, or to accommodate mine facilities, as was the case with the Spring Draw Tract. These small additions must, of course, be found appropriate for leasing after a full application of the unsuitability criteria and site specific multiple use analysis. The Department must be permitted to adjust lease boundaries to a limited extent to obtain maximum economic recovery of the coal. *See* 30 U.S.C. § 201(a)(1); 43 C.F.R. § 3420.4–3(b)(2). Addition of 680 acres to the Spring Draw Tract will permit the mine facilities and access roads to be located somewhere other than right on top of the coal outcrop to be mined. Thus, the Court cannot conclude that the inclusion of the 680 acre portion made the sale of the Spring Draw tract incompatible with the comprehensive land use plan.

The Court therefore holds that sale of all the Montana tracts and the South Duck Nest Creek, Little Rawhide Creek, and Spring Draw tracts in Wyoming was compatible with the applicable comprehensive land use plans. This holding, however, should not be construed in any way to be an opinion on the adequacy of the underlying comprehensive land use plans. Those matters are the substance of plaintiffs' Count II.

### E. *Count IV—Reclaimability Criteria*

In Count IV of their amended complaint, plaintiffs allege that the Secretary violated Section 522 of SMCRA, 30 U.S.C. § 1272, by failing to review lands covered by the land use plan to determine whether there are areas where reclamation is not technologically or economically feasible. Plaintiffs direct their challenge at the land use plan and claim that the Secretary was mandated by § 522(b) to apply reclaimability criteria during the federal lands review process in the land use planning stage.

The Secretary has chosen to defer final determinations of whether certain parcels of land which offered in the Powder River coal lease sale are reclaimable until submission of a lessee's mining plan. In 1979, when the coal management regulations were adopted, the Department reasoned that detailed assessments of reclaimability should not be made before issuance of leases because excessive expenditures of money and personnel would be required to gather the data necessary to make such determinations at an early stage. A decision was made to apply reclaimability criteria in the mine plan approval process and condition leases to make certain that mining did not occur in areas unsuitable for reclamation. *See* 44 Fed.Reg. 42604 (July 19, 1979).

Defendants contend that Count IV should be dismissed because the Court lacks subject matter jurisdiction. Even though the complaint makes no mention of the implementing regulations, defendants claim that plaintiffs are attempting to attack the regulations under the guise of attacking the land use plan. Judicial review of the implementing regulations which were issued in 1979 after a lengthy rulemaking process is, defendants reason, foreclosed by the 60–day limit on judicial review found in § 526 of SMCRA, 30 U.S.C. § 1276(a)(1). The Court agrees.

Section 526 provides in pertinent part: Any action by the Secretary promulgating national rules or regulations ... shall be subject to judicial review in the United States District Court for the District of Columbia Circuit. Any other action constituting rulemaking by the Secretary shall be subject to judicial review only by the United States District Court for the District in which the surface coal mining operation is located. .... A petition for review of any action subject to judicial review under this subsection shall be filed in the appropriate Court within sixty days from the date of such action, or after such date if the petition is based solely on grounds arising after the sixtieth day....

30 U.S.C. § 1276(a)(1). The overriding congressional purpose of setting the venue and limiting judicial review to 60 days after the regulations are promulgated is to obtain a degree of uniformity and finality to the regulations and their interpretation that may otherwise be absent.

Plaintiffs' Count IV, although couched in terms of the land use plan and alleged statutory requirements of SMCRA, is tantamount to a collateral attack on the propriety of the regulations implementing § 526 of SMCRA. In the amended complaint's prayer for relief, plaintiffs ask the Court to "adjudge and declare that insofar as the Federal Coal Management Program's regulations do not require unsuitability review pursuant to the reclaimability standard, they are in violation of SMCRA." Amended Complaint at 20. To grant plaintiffs' requested relief would require that the Court declare the Secretary's decision to defer unsuitability determinations with respect to reclamation to a later stage in leasehold development, as set forth in the regulations, to be violative of SMCRA's dictates. Plaintiffs do not argue that the Department has misapplied the regulations to this particular case; they are challenging a national standard by arguing that the Secretary violated SMCRA even though he acted in accordance with the implementing regulations.

Plaintiffs cite *Holmes Limestone Co. v. Andrus*, 655 F.2d 732 (6th Cir.1981), *cert. denied* 456 U.S. 995, 102 S.Ct. 2280, 72 L.Ed.2d 1292 (1982), in support of their contention that the restrictions on judicial review imposed by § 526 are inapplicable to their claim. In *Holmes Limestone*, a small mining company challenged the Secretary's construction and application of SMCRA and the regulations which prevented the company from engaging in surface mining operations near private family burial plots on Amish farms. The Department's Office of Surface Mining (OSM) restricted the company from mining within 100 feet of the burial plots contrary to the wishes of the Amish owners and evidence that such mining could be accomplished without harming the gravesites. The company sought to have the district court declare the 100–foot regulation arbitrary, capricious, and inconsistent with SMCRA. The district court concluded that it lacked jurisdiction to consider the challenge to the regulations under § 526. The Sixth Circuit Court of Appeals reversed. The court, relying upon the presumption that agency actions should be subject to judicial review and stressing that neither the mining company nor the Amish landowners had previous knowledge of SMCRA and had not participated in the promulgation of the regulations, found that the regulation could be challenged in a district court outside the District of Columbia even though the 60 days for review had expired.

Several factors, however, lead this Court to conclude that *Holmes Limestone* does not control here. First, as noted by the Fourth Circuit in *Commonwealth of Virginia, ex rel. Department of Conservation and Economic Development v. Watt*, 741 F.2d 37 (4th Cir.1984), the regulation reviewed in *Holmes Limestone* "did not define the term 'cemetery' and, therefore, it is arguable that the mining operators' action challenging the Secretary's construction of that term to include private family burial plots was not even an indirect attack on a federal regulation...." *Id.* at 41 n. 5. Second, *Holmes Limestone* has become somewhat isolated in that at least two circuits have expressly rejected its rationale. *See Commonwealth of Virginia*, 741 F.2d at 41; *Drummond Coal Co. v. Watt*, 735 F.2d 469, 473 (11th Cir.1984). Third, the present case differs considerably from *Holmes Limestone*, where the plaintiffs were not aware of the promulgation and content of the regulations. To the contrary, these legally sophisticated plaintiffs have participated extensively in the administrative rulemaking leading up to the issuance of the 1979 regulations. *See, e.g., In re Surface Mining Regulations*, 456 F.Supp. 1301, 1306 (D.D.C.1978), *modified*, 627 F.2d 1346 (D.C.Cir.1980).

■ Plaintiffs next argue that the Court has jurisdiction to hear Count IV under the citizens' suit provision of SMCRA, 30 U.S.C. § 1270.[11] Section 1270(a)(2) allows an adversely affected party to bring suit in the district court "where there is alleged a failure of the secretary ... to perform any act or duty under this chapter which is not discretionary with the secretary...." A citizen suit under § 1270(a)(2), however, may not be commenced until 60 days after plaintiff has given written notice of such action to the Secretary.

Plaintiffs' Count IV does not qualify as a citizen's suit under SMCRA. Contrary to plaintiffs' contention, the duty challenged is a discretionary duty. Even assuming, as plaintiffs argue, that § 1272(a)(5) applies in the federal land review process under

---

11. This claim is somewhat belated in that plaintiffs did not plead § 1270 as a basis for jurisdiction in their complaint. Nor did they argue for such jurisdiction in their earlier briefs.

§ 1272(b), § 1272(a)(5) requires only that "determinations of the unsuitability of land for surface coal mining ... shall be integrated *as closely as possible* with present and future land use planning and regulation processes at the Federal, State, and local levels." (emphasis added). Although this section mandates that the unsuitability criteria and the land use planning processes be integrated, the directive "as closely as possible" introduces a limited element of discretion allowing the Secretary some degree of latitude in determining when to assess reclaimability and apply other unsuitability criteria.

Moreover, citizen suit provisions cannot be used to collaterally attack regulations outlining national standards for which the period of judicial review has expired. *See, e.g., Oljato Chapter of Navaho Tribe v. Train,* 515 F.2d 654, 658–661 (D.C.Cir.1975) (involved a similar attempt to use a citizen suit provision of the Clean Air Act). The predominant purpose of the citizen suit provision is to allow citizens a forum to seek enforcement of nondiscretionary duties owed under established regulatory standards rather than to provide a means to challenge the standards themselves. *Cf. Natural Resources Defense Council, Inc. v. Environmental Protection Agency,* 512 F.2d 1351, 1355 (D.C.Cir.1975).

The Court holds, therefore, that plaintiffs' Count IV is a collateral challenge to a national standard set forth in a properly promulgated regulation, and that the claim is time barred by the sixty-day statute of limitations set out in 30 U.S.C. § 1276. Count IV must be dismissed for lack of jurisdiction.

### F. *Count V—Adoption of Bidding Procedures*

 Plaintiffs' Count V alleges that a violation of the APA's rulemaking provisions makes sale of the Cook Mountain and Rocky Butte tracts unlawful. Both of these tracts were subject to non-transferable surface owner consent agreements with coal companies. Under previous department practices, tracts with non-transferable consents could only be sold by intertract bidding procedures (*see supra* note 1). In March 1982, just prior to the Powder River sale, Secretary Watt decided to change this practice and permit sale of such tracts by single tract competitive bidding. This action made it possible to offer the Cook Mountain and Rocky Butte tracts by single tract procedures. Plaintiffs allege that this change in the bidding practice violated 5 U.S.C. § 553 which requires that the public be given notice of an opportunity to comment upon a proposed rule change.

SMCRA provides that "[t]he secretary shall not enter into any lease of Federal coal deposits until the surface owner has given written consent to enter and commence surface mining operations and the secretary has obtained evidence of such consent." 30 U.S.C. § 1304(c). The regulations require that surface owner consent be transferable to the successful bidder for the lease tract. 43 C.F.R. § 3427.2(e)(1). SMCRA, however, grandfathered in all valid consents, both transferable and non-transferable, which were given by a surface owner prior to August 3, 1977. 30 U.S.C. § 1304(c). The coal management regulations, as adopted in 1979, provided that:

> An otherwise valid written consent given by a qualified surface owner prior to August 4, 1977, shall be considered valid for the purposes of this subpart.

43 C.F.R. § 3427.4 (1981). In 1982, § 3427.4 was amended to clarify that all written pre-SMCRA consents, regardless of their terms, even consents that were non-transferable, were valid.

> An otherwise valid written consent given by a qualified surface owner prior to August 4, 1977, shall not be required to meet the transferability provisions of § 3427.2(e)(1) of this part.

The Department's first proposed coal management regulation stated a requirement that coal subject to pre-SMCRA non-transferable consents would be leased only through intertract bidding procedures. *See* 44 Fed.Reg. 16826 (March 19, 1979). It is evident, however, that the Department from the outset believed that it had the discretion to choose whatever acceptable bidding method seemed best for a given tract. *See* Secretarial Issue Document, Federal Coal Management Program, Volume I, Part A, pages 84–86 (Admin.Rec. at 1). The final regulations, issued in July 1979 made no mention of the intertract bidding requirement for coal subject to non-transferable consents. The preamble to those regulations stated that it remained

departmental "policy" to use intertract bidding as set out in the proposed rule.[12]

On February 5, 1982, the Department approved a "policy change" and decided to no longer require that tracts with non-transferable consents be sold by intertract bidding but to permit sale by single tract competitive bidding (Admin.Rec. at 378). This "new policy" was described in the published preamble to competitive leasing regulation amendments. 47 Fed.Reg. 9008, 9009 (March 3, 1982). The issue presented by plaintiffs' Count V is whether this change in bidding practice constitutes a policy change or rulemaking. If the latter is the case, then the Department violated 5 U.S.C. § 553 which requires notice and an opportunity for comment.

An agency's treatment and designation of a particular practice provides some indication of the nature of the practice. *See Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33 (D.C.Cir.1974). The agency's characterization, however, is not dispositive. *See Chamber of Commerce v. OSHA*, 636 F.2d 464, 468 (D.C.Cir. 1980). The Court finds it significant that the Department has consistently characterized its choice of bidding procedures for coal deposits with pre–SMCRA non-transferable consents as policy.

■ Distinguishing between general statements of policy and substantive rules is sometimes a difficult task. Generally, rules establish a standard of conduct which has the force and effect of law. *Chrysler Corp. v. Brown*, 441 U.S. 281, 297, 99 S.Ct. 1705, 1715, 60 L.Ed.2d 208 (1979). A rule affects the rights and obligations of the parties being regulated. *Id.* at 302, 99

S.Ct. at 1718. Administrative proceedings held subsequent to the promulgation of a rule turn on whether the adjudicated facts conform to the rule and whether the rule should be applied in that instance. *Pacific Gas*, 506 F.2d at 38.

■ A general statement of policy, on the other hand, establishes non-binding norms or flexible criteria that do not have the force and effect of law. *Id.* These statements are directed toward agency personnel, *see Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), and tentatively guide future agency actions. *Pacific Gas*, 506 F.2d at 38.

Application of these standards to the Department's bidding practices leads the Court to conclude that employing intertract bidding procedures to lease federal coal tracts with pre–SMCRA non-transferable consents was departmental policy.[13] The pronouncement merely set departmental guidelines for the future leasing of such tracts, but the Department retained the discretion to tailor bidding procedures to lease tracts, even those with non-transferable consents, on a case-by-case basis. So long as fair market value is received and a tract is otherwise properly leased, the Department's choice of which bidding procedure to employ at the sale has no bearing on private rights and obligations. The change in policy respecting bidding procedures has no substantial impact on regulated parties, plaintiffs, or the general public. *Cf. Stoddard Lumber Co. v. Marshall*, 627 F.2d 984, 987–88 (9th Cir.1980). It set no standard of conduct to which those outside

---

**12.** This policy stemmed from a perception that bidding competition would be diminished on tracts with non-transferable consents by the usual single tract procedures because the holder of the non-transferable consent held it exclusively and thus would have a distinct advantage in both bidding for and developing a lease tract. It was considered likely that only the consent holder would bother to bid for the tract.

**13.** Although the Court finds that the change in bidding procedure was a policy change rather

than rulemaking, the sale of a tract having a pre–SMCRA non-transferable consent by single tract competitive bidding is a factor to be taken into account when determining whether fair market value was received for the tract. The Department itself recognized that "changing the policy may discourage competition in bidding because of the presumed exclusivity of the non-transferable consents." Memorandum to Ass't Secretary, Land and Water Resources, From Director, BLM, Feb. 5, 1982 (Admin.Rec. at 378).

the agency were required to adhere. Consequently, there was no requirement that the Department comply with the notice and comment procedure in 5 U.S.C. § 553.

An appropriate order shall issue in accordance with this Memorandum Opinion.

## ORDER

Pursuant to the memorandum opinion filed this day in the above-captioned case,

IT IS ORDERED that:

1. Summary judgment is granted in favor of defendants and against plaintiffs on Counts III and V of plaintiffs' amended complaint;

2. Count IV of plaintiffs' amended complaint is dismissed for lack of jurisdiction;

3. The federal defendants' motion to dismiss Counts I and V for lack of standing is denied;

4. After reconsideration, plaintiffs' motions to compel discovery directed at the federal defendants, Meadowlark Farms, Inc., and Shell Oil Company are denied;

5. After reconsideration, the motions of federal defendants, Shell Oil Company and Meadowlark Farms, Inc., for protective orders and to quash interrogatories and requests for production are granted. The federal defendants shall, however, review their records and supplement the administrative record on or before September 30, 1985, in a manner consistent with the Court's memorandum opinion. Those documents deemed confidential by federal defendants shall be submitted separately and shall be protected in accordance with the Court's confidentiality order filed November 24, 1982.

6. Plaintiffs shall have until October 31, 1985, to file a substantive response to defendants' motions for summary judgment on Counts I and II. Defendants may reply on or before November 22, 1985. Briefing shall be confined to those matters raised in Counts I and II.

Entry of judgment on Counts III, IV, and V shall be delayed until resolution of the remaining counts.