914 F.2d 1311
 59 USLW 2217, 21 Envtl. L. Rep. 20,019
 SEATTLE AUDUBON SOCIETY; Pilchuck Audubon Society;
Washington Environmental Council; Washington Native Plants
Society; Oregon Natural Resources Council, Inc.; Portland
Audubon Society; Lane County Audubon Society; Siuslaw Task
Force, Plaintiffs-Appellants,
v.
F. Dale ROBERTSON, in his official capacity as Chief, United
States Forest Service; United States Forest
Service, an agency of the United States,
Defendants-Appellees.
SEATTLE AUDUBON SOCIETY; Pilchuck Audubon Society;
Washington Environmental Council; Washington Native Plants
Society; Oregon Natural Resources Council, Inc.; Portland
Audubon Society; Lane County Audubon Society; Siuslaw Task
Force, Plaintiffs-Appellants,
v.
F. Dale ROBERTSON; United States Forest Service, Defendants-Appellees,
Northwest Forest Resource Council; Association of O & C
Counties, Defendant/Intervenors-Appellees.
 Nos. 90-35020, 90-8008.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 3, 1990.
Decided Sept. 18, 1990.
As Amended Oct. 30, 1990.
 
 Todd D. True, Sierra Club Legal Defense Fund, Inc., Seattle, Wash., for plaintiffs-appellants.
 Michael Axline, Western Natural Resources Law Clinic, Eugene, Oregon, for Oregon Natural Resources Council.
 Mark C. Rutzick, Preston, Thorgrimson, Shidler, Gates & Ellis, Portland, Or., for Northwest Forest Resource Council.
 Phillip Chadsey, Stoel, Rives, Boley, Jones & Grey, Portland, Or., for Association of O & C Counties.
 Martin W. Matzen, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before GOODWIN, SCHROEDER and PREGERSON, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 These consolidated appeals arise out of the ongoing controversy over logging in old growth forests in Oregon and Washington and the impact of that logging on the northern spotted owl. In response to ongoing legal disputes, Congress enacted section 318 of the Department of the Interior and Related Agencies Appropriations Act for Fiscal Year 1990, Pub.L. No. 101-121, 103 Stat. 701, 745-50 (1989) ("section 318"). Section 318 would allow timber sales in old growth forests in Oregon and Washington in fiscal year 1990. The issue before us is whether section 318 violates the separation of powers doctrine by directing the judiciary to reach a particular result in the two cases underlying this appeal.
 
 BACKGROUND
 
 2
 In October 1987, the Portland Audubon Society ("Portland Audubon") and other environmental organizations filed an action in district court for declaratory and injunctive relief, challenging forest management activities of the Bureau of Land Management, U.S. Department of the Interior ("BLM"), as violating the National Environmental Protection Act ("NEPA"), 42 U.S.C. Secs. 4321-4347, the Oregon & California Lands Act, 43 U.S.C. Sec. 1181, the Federal Land Policy and Management Act, 43 U.S.C. Secs. 1701-1782, and the Migratory Bird Treaty Act, 16 U.S.C. Secs. 703-711. The district court dismissed the action, and we reversed. Portland Audubon Soc'y v. Hodel, 866 F.2d 302 (9th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989). On remand, the district court again dismissed the action. Portland Audubon Soc'y v. Lujan, 712 F.Supp. 1456 (D.Ore.1989). We affirmed the dismissal of the NEPA claim, but reversed the dismissal of the non-NEPA claims. Portland Audubon Soc'y v. Lujan, 884 F.2d 1233 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990). On October 23, 1989, Portland Audubon renewed its motion in the district court for summary judgment under the Oregon and California Lands Act, the Federal Land Policy and Management Act, and the Migratory Bird Treaty Act.
 
 
 3
 On February 8, 1989, the Seattle Audubon Society and other environmental organizations ("Seattle Audubon") filed a complaint in district court for declaratory and injunctive relief, challenging the United States Forest Service's ("Forest Service") administrative decision adopting certain timber management guidelines as affording inadequate protection to the northern spotted owl. A month later, the Washington Contract Loggers Association also filed suit, challenging the guidelines as overly restricting timber harvesting. Seattle Audubon and the Washington Contract Loggers Association moved for preliminary injunctions. The district court initially denied both motions, but later granted Seattle Audubon's renewed motion for a preliminary injunction and enjoined certain planned timber sales.
 
 
 4
 Meanwhile, Congress passed section 318, which went into effect October 23, 1989. The "Northwest Timber Compromise," inter alia, requires the Forest Service and BLM to sell in fiscal year 1990 7.7 billion board feet of timber, of which 5.8 billion is to come from Oregon and Washington. Sec. 318(a)(1). Section (b)(3) sets out a timber management plan for national forest lands in Oregon and Washington. Under this section, no sales are to come from Spotted Owl Habitat Areas identified in the Environmental Impact Statement and Record of Decision of 1988, prepared in relation to proposed timber sales on Forest Service land. Section (b)(3) also adds about 3,200 acres to the protected forest area in the affected national forests. Sec. 318(b)(3). Section (b)(5) sets out a timber management plan for certain BLM lands in Oregon. Under this section, no sales are to come from areas identified as Spotted Owl Habitat Areas in an agreement between BLM and the Oregon Department of Fish and Wildlife, dated December 22, 1987. Section (b)(5) also directs BLM to identify an additional 12 protected areas on affected BLM land. Sec. 318(b)(5).
 
 
 5
 At the heart of these appeals is section 318(b)(6)(A), which specifically refers to the two cases now before us and provides:
 
 
 6
 Without passing on the legal and factual adequacy of the Final Supplement to the Environmental Impact Statement for an Amendment to the Pacific Northwest Regional Guide--Spotted Owl Guidelines and the accompanying Record of Decision issued by the Forest Service on December 12, 1988 or the December 22, 1987 agreement between the Bureau of Land Management and the Oregon Department of Fish and Wildlife for management of the spotted owl, the Congress hereby determines and directs that management of areas according to subsections (b)(3) and (b)(5) of this section on the thirteen national forests in Oregon and Washington and Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases captioned Seattle Audubon Society et al., v. F. Dale Robertson, Civil No. 89-160 and Washington Contract Loggers Assoc. et al., v. F. Dale Robertson, Civil No. 89-99 (order granting preliminary injunction) and the case Portland Audubon Society et al., v. Manuel Lujan, Jr., Civil No. 87-1160-FR. The guidelines adopted by subsections (b)(3) and (b)(5) of this section shall not be subject to judicial review by any court of the United States.
 
 
 7
 On November 6, 1989, based on section 318 the district court in Seattle Audubon vacated the preliminary injunction. The district court rejected Seattle Audubon's argument that section 318(b)(6)(A) violates the separation of powers doctrine and is therefore unconstitutional. The district court retained jurisdiction over the case and certified for interlocutory appeal under 28 U.S.C. Sec. 1292(b) its decision to vacate the preliminary injunction. On December 21, 1989, the district court in Portland Audubon granted the government's motion to dismiss, based on section 318, over Portland Audubon's constitutional challenge to section 318(b)(6)(A).
 
 
 8
 Portland Audubon and Seattle Audubon filed timely notices of appeal. We have jurisdiction over Seattle Audubon's interlocutory appeal in Seattle Audubon under 28 U.S.C. Sec. 1292(b) and over the district court's final order in Portland Audubon under 28 U.S.C. Sec. 1291.
 
 STANDARD OF REVIEW
 
 9
 The constitutionality of a statute is a question of law. We therefore review the district courts' rulings de novo. Trerice v. Pedersen, 769 F.2d 1398, 1400 (9th Cir.1985).
 
 DISCUSSION
 
 10
 The Supreme Court "consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647, 658, 102 L.Ed.2d 714 (1989). In this case we must decide whether, in enacting section 318, Congress went beyond the limits of its power established in the Constitution.
 
 
 11
 By section 318, Congress for the first time endeavors to instruct federal courts to reach a particular result in pending cases identified by caption and file number. Subsection (b)(6)(A) raises serious constitutional concerns in light of Article III's stated premise that the judicial power of the United States, encompassing cases and controversies, lies in the federal courts and not in Congress.
 
 
 12
 In United States v. Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871), the Supreme Court struck down an act of Congress because it violated the separation of powers doctrine. The plaintiff in Klein, the administrator of the deceased owner of property sold by federal agents during the Civil War, sued for proceeds of that sale under a law that gave a cause of action to recover such proceeds to noncombatant confederate landowners upon proof of loyalty to the federal government. The Supreme Court, in an earlier case, decided that receipt of a Presidential pardon was sufficient proof of "loyalty" under this law. Because the deceased landowner in Klein had received a pardon, the court of claims awarded recovery. Pending the government's appeal from the court of claims' decision, Congress passed a statute providing that no pardon was admissible as proof of loyalty to the federal government and that acceptance of a pardon, under most circumstances, was conclusive evidence of disloyalty. The statute directed the Supreme Court and the court of claims to find that a claimant who accepted a Presidential pardon without disclaiming previous disloyalty was in fact disloyal and, therefore, not entitled to land sale proceeds under the law which allowed a noncombatant confederate claimant to receive those proceeds upon proof of loyalty. The newly enacted statute further directed the Supreme Court to dismiss any case in which a claimant had prevailed in the court of claims if the claimant prevailed upon proof of loyalty by Presidential pardon.
 
 
 13
 The Court explained that the effect of the statute was to deny jurisdiction to the Supreme Court and court of claims "solely on the application of a rule of decision, in causes pending prescribed by Congress." Id. (13 Wall.) at 146. This, the Court held, Congress could not do: "It seems to us that this is not an exercise of the acknowledged power of Congress to make exceptions and prescribe regulations to the appellate power." Id. Because Congress had "prescribe[d] a rule for the decision of a cause in a particular way," Congress "passed the limit which separates the legislative from the judicial power," and the provision was declared unconstitutional. Id. at 146-47.
 
 
 14
 Significantly, the Court in Klein distinguished an earlier, similar case, Pennsylvania v. The Wheeling and Belmont Bridge Co., 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855). There, the Court had originally held that a bridge was an obstruction. Intervening legislation, however, made the bridge a post-road for passage of the United States mail and required that navigation not interfere with the bridge. The Court concluded in Wheeling Bridge that this new statute changed the previous law. "[A]lthough [the bridge] still may be an obstruction in fact, [it] is not so in the contemplation of law." Id. (18 How.) at 430. The court, therefore, decided the case on the theory that Congress had changed the law, not that Congress had told the court that it should decide the case differently under the same law. As such, Wheeling Bridge differed from Klein in a critically important aspect: "No arbitrary rule of decision was prescribed in [Wheeling Bridge ], but the court was left to apply its ordinary rules to the new circumstances created by the act. In [Klein ], no new circumstances ha[d] been created by legislation." Klein, 80 U.S. at 146-47.
 
 
 15
 Congress exists to write and change our laws, and the courts are bound to apply the law extant at the time of decision. United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). We read Klein and Wheeling Bridge, however, as delineating limits of congressional power to control litigation through legislation. Congress can amend or repeal any law, even for the purpose of ending pending litigation. Wheeling Bridge, 59 U.S. at 421; see also State of Ark. v. Goldschmidt, 627 F.2d 839, 842 (9th Cir.1980) (appeal rendered moot by legislation). But Congress cannot "prescribe a rule for a decision of a cause in a certain way" where "no new circumstances have been created by legislation." Klein, 80 U.S. at 147.
 
 
 16
 More recent Supreme Court authority also strongly suggests that the critical distinction, for purposes of deciding the limits to Congress' authority to affect pending litigation through statute, is between the actual repeal or amendment of the law underlying the litigation, which is permissible, and the actual direction of a particular decision in a case, without repealing or amending the law underlying the litigation, which is not permissible. See United States v. Sioux Nation of Indians, 448 U.S. 371, 405, 100 S.Ct. 2716, 2735-36, 65 L.Ed.2d 844 (1980) (reason the statute at issue in Klein was unconstitutional was that "it prescribed a rule of decision in a case pending before the courts").
 
 
 17
 Though the precise contours are difficult to discern, we have recognized the limits the Constitution puts on congressional power to control federal courts' jurisdiction. In Konizeski v. Livermore Labs (In re Consolidated United States Atmospheric Testing Litigation), 820 F.2d 982, 992 (9th Cir.1987), cert. denied, 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988), we noted that "[c]ongressional attempts to alter the rule of decision in pending cases in favor of the government have been condemned as a violation of Article III." But despite this broad language, Atmospheric Testing interpreted Klein restrictively: " 'Congress violates the separation of powers when it presumes to dictate "how the Court should decide an issue of fact (under threat of loss of jurisdiction)" and purports to "bind the Court to decide a case in accordance with a rule of law independently unconstitutional on other grounds." ' " Atmospheric Testing, 820 F.2d at 992 (emphasis added) (quoting United States v. Brainer, 691 F.2d 691, 695 (4th Cir.1982) (quoting P. Bator, D. Shapiro, P. Mishkin & H. Wechsler, Hart & Wechsler's The Federal Courts and The Federal System, 316 n. 4 (2d ed. 1973))).
 
 
 18
 In a case decided last year, Grimesy v. Huff, 876 F.2d 738 (9th Cir.1989), we clarified this restrictive language by making the Atmospheric Testing holding disjunctive rather than conjunctive. 876 F.2d at 744.
 
 
 19
 This interpretation is consistent with the language of the Supreme Court's decision in Klein and with subsequent Court authority on the separation of powers doctrine. See United States v. Sioux Nation of Indians, 448 U.S. at 404-05, 100 S.Ct. at 2735-36. We thus conclude that Ninth Circuit law does not require both a finding that Congress has impermissibly directed certain findings in pending litigation, without changing any underlying law, and that a challenged statute be independently unconstitutional on other grounds. Reading Klein in the conjunctive would require that Congress' action be unconstitutional on two grounds--an illogical requirement.
 
 
 20
 The issue before us, then, is whether section 318 is a permissible modification of the law underlying the two cases before us, as the district courts held, or an impermissible directive from Congress to the courts to decide the cases in a particular way. We conclude that subsection (b)(6)(A) runs afoul of the separation of powers doctrine.
 
 
 21
 Section 318 does not, by its plain language, repeal or amend the environmental laws underlying this litigation, even though some subsections add additional requirements.[1] The clear effect of subsection (b)(6)(A) is to direct that, if the government follows the plan incorporated in subsections (b)(3) and (b)(5), then the government will have done what is required under the environmental statutes involved in these cases. Thus, if the Secretary does follow subsections (b)(3) and (b)(5) by observing their limitations on owl habitat, then the Secretary will be deemed in fact to have met as well the requirements of several environmental statutes.
 
 
 22
 In this way Congress, through section 318, seeks to perform functions reserved to the courts by Article III of the Constitution. For example, if the Secretary follows subsection (b)(3) and (b)(5), then the Secretary will be found to have used the "principles of multiple use and sustained yield" and the "systematic interdisciplinary approach" mandated by the Federal Land Policy and Management Act, 43 U.S.C. Sec. 1712(c)(1) and (2). In addition, the agency will be deemed to have included detailed statements of adverse environmental effects and alternatives required under NEPA, 42 U.S.C. Sec. 4332. Also, there will have been no taking of habitat as proscribed under the Migratory Bird Treaty Act, 16 U.S.C. Sec. 703.
 
 
 23
 Subsection (b)(6)(A) here at issue does not establish new law, but directs the court to reach a specific result and make certain factual findings under existing law in connection with two cases pending in federal court. This is what Klein and subsequent cases agree is constitutionally proscribed. See Grimesy v. Huff, 876 F.2d at 738 (no constitutional violation because "the statute in question neither direct[ed] the court to make a certain finding of fact nor requir[ed] [the court] to apply an unconstitutional law" (quoting Atmospheric Testing, 820 F.2d at 992)); see also United States v. Sioux Nation of Indians, 448 U.S. at 404-05, 100 S.Ct. at 2735-36.
 
 
 24
 It is this key aspect that distinguishes subsection (b)(6)(A) from the statutory provisions we upheld in Stop H-3 Ass'n v. Dole, 870 F.2d 1419 (9th Cir.1989). In that case, an appropriations bill provision directed the Secretary of Transportation to build a highway--the subject of prolonged litigation under various environmental protection statutes--"notwithstanding" those environmental statutes' requirements. The statute challenged in Stop H-3 simply ordered construction of the highway and specifically, as a matter of permanent law, withdrew the statutory environmental protection provisions underlying the ongoing litigation as to the challenged project by exempting the project from the provisions' requirements. Id. at 1437.[2] The provision at issue in Stop H-3 did not leave the underlying statute intact (as to the H-3 project), order a course of government action, and then direct a court finding that the environmental statutes' requirements were satisfied by the government action ordered. That is what Congress did when it enacted section 318, at issue in the present case.
 
 
 25
 We must uphold a statute if "it is fairly possible to interpret the [challenged] statute in a manner that renders it constitutionally valid." Communication Workers of Am. v. Beck, 487 U.S. 735, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988). That Congress could possibly have written a valid statute, however, does not mean that we can "fairly" interpret the statute that Congress in fact enacted as constitutionally valid. The language of section 318 is clear: Congress not only legislated a forest management plan, Secs. 318(b)(3), (b)(5), but also directed the courts to find that that plan satisfied the environmental laws underlying the ongoing litigation. Sec. 318(b)(6)(A). In doing so, Congress did not amend or repeal laws, as it unquestionably could do, but rather prescribed a rule for the decision of a cause in a particular way, without changing the underlying laws, as it unquestionably cannot do.[3]
 
 
 26
 We note further that, even if we could interpret section 318 as a temporary repeal of the environmental laws at issue in the underlying litigation, then section 318 would amount to an implied partial repeal of the environmental statutes. That is what we held in Portland Audubon Soc'y v. Hodel, 866 F.2d at 307, Congress could not do in an appropriations measure. In so holding, we followed the Supreme Court in Tennessee Valley Auth. v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). These principles preclude a saving interpretation of subsection (b)(6)(A).
 
 CONCLUSION
 
 27
 Although the legislative history of section 318 disguises the act as changing legal standards, the statutory language itself does not do so. The first sentence of subsection (b)(6)(A) violates the separation of powers doctrine.[4]
 
 
 28
 The judgments of the district courts are REVERSED. The cases are remanded to the district courts for proceedings consistent with this opinion. This order shall act as and for the mandate in these cases and the pending motion to recall the mandate is denied.
 
 
 
 [1]
 For example, subsection (b)(2) requires that fragmentation of ecologically significant old growth forest stands be minimized, and subsections (b)(3) and (b)(5) forbid timber sales in specified areas where spotted owls are found
 
 
 [2]
 Section 114 of the Continuing Appropriations Bill for Fiscal Year 1987, Pub.L. No. 99-500, Sec. 106, 100 Stat. 1783 (later reenacted as Pub.L. No. 99-591, 100 Stat. 3341) stated in relevant part:
 (a) The Secretary of Transportation shall approve the construction of Interstate Highway H-3 between the Halawa interchange to, and including the Halekou interchange (a distance of approximately 10.7 miles), and such construction shall proceed to completion notwithstanding section 138 of title 23 and section 303 of title 49, United States Code.
 (Emphasis added.) Sections 138 and 303, the so-called "4(f)" provisions, require the Secretary of Transportation, before building a highway through certain ecologically important areas, to take various steps in order to protect the environment.
 
 
 [3]
 We are not persuaded that the legislative history of section 318 requires a different conclusion. The House report accompanying the measure does state that section 318(b)(6)(A) "does not pass on the legal sufficiency of the existing Forest Service [Record of Decision] or the [Bureau of Land Management/Oregon Department of Fish and Wildlife] agreement insofar as each addresses concerns about the northern spotted owl." H.R. Conf. Rep. No. 264, 101st Cong., 1st Sess. 88-89 (1987). The same report, however, states that section 318 "in no way alters application of the Endangered Species Act or other environmental laws to Forest Service and BLM management activities." Id. at 89. We decline to read these mixed signals to change the plain meaning and effect of subsection (b)(6)(A)
 
 
 [4]
 We express no opinion on the validity of the second and final sentence of subsection (b)(6)(A)