NATIONAL AUDUBON SOCIETY; Oregon Natural Resources Council; Lane County Audubon Society; Friends of Greensprings; Headwaters; Soda Mountain Wilderness Council; Sky Lakes Wilderness Committee, Plaintiffs–Appellants,

v.

**U.S. FOREST SERVICE,**
Defendant–Appellee,

and

Bill Christie, Jr.; Huffman and Wright Logging Company, Defendants–Intervenors–Appellees.

NATIONAL AUDUBON SOCIETY; Oregon Natural Resources Council; Friends of Greensprings; Headwaters, et al., Plaintiffs–Appellees,

v.

**U.S. FOREST SERVICE,**
Defendant–Appellant,

and

Bill Christie, Jr.; Huffman and Wright Logging Company, Defendants–Intervenors.

NATIONAL AUDUBON SOCIETY; Oregon Natural Resources Council; Lane County Audubon Society; Friends of Greensprings; Headwaters, et al., Plaintiffs–Appellees,

v.

U.S. FOREST SERVICE, Defendant,

and

Bill Christie, Jr.; Huffman and Wright Logging Company, Defendants–Intervenors–Appellants.

Nos. 91–35214, 91–35262 and 91–35265.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 15, 1992.

Submission Withdrawn June 10, 1993.

Resubmitted Sept. 8, 1993.

Decided Sept. 15, 1993.

As Amended on Denial of Rehearing Aug. 30, 1994.

David C. Shilton and John T. Stahr, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for defendant-appellant-cross-appellee.

Scott W. Horngren, Haglund & Kirtley, Portland, OR, for defendants-intervenors-appellants-cross-appellees.

Gary K. Kahn, Reeves, Kahn & Eder, Portland, OR, for plaintiff-appellee-cross-appellant.

Before: BEEZER, NOONAN, and TROTT, Circuit Judges.

## ORDER

The panel has voted to amend its opinion filed September 15, 1993 [4 F.3d 832] as follows:

(1) The third sentence of the first [last] full paragraph on page 9927 [834] of the slip opinion is amended to read as follows: "In affirming the district court, we held the Final EIS contained an inadequate discussion of site-specific environmental consequences of the nonwilderness allocations, as well as an inadequate range of alternatives."

With this amendment, the panel has voted to deny the petition for rehearing.

## OPINION

TROTT, Circuit Judge:

At issue is a challenge to four timber sales—the Ace, Butch, Varmit and Head timber sales—on unroaded and undeveloped areas of the Rogue River National Forest in Oregon. The United States Forest Service, Bill Christie Jr., and Huffman and Wright Logging Co. appeal the district court's order permanently enjoining these timber sales pending completion of an environmental impact statement ("EIS"). The National Audubon Society and other environmental organizations ("Audubon Society") seek attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (1988) ("EAJA"). We have jurisdiction under 28 U.S.C. § 1291 (1988), and we affirm in part, reverse in part, and remand the case to the district court with directions to review the Forest Service's actions under the "arbitrary and capricious" standard.

### I

### FACTS

Through the Wilderness Act of 1964, Congress created the National Wilderness Preservation System ("Wilderness System") to provide protection for lands relatively untouched by human activity. See 16 U.S.C. § 1131 (1976). Under this Act, the Department of Agriculture is directed to recommend "primitive" areas which should be added to wilderness areas created on national

forest lands. *Id.* § 1132. In 1972, the Forest Service conducted the "Roadless Area Review and Evaluation" ("RARE I") in which roadless areas within the National Forest System were identified for possible inclusion into the Wilderness System. By October, 1973, the RARE I inventory resulted in the Forest Service's selection of 274 roadless and undeveloped areas for study as possible wilderness. However, further selection of these lands was enjoined pending the Forest Service's completion of an EIS pursuant to the requirements of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (1988) ("NEPA"). *See Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (10th Cir.1973).

In June, 1977, the Forest Service began its second Roadless Area Review and Evaluation (RARE II) in which all roadless areas within the National Forest System were inventoried and categorized as either "wilderness," "further planning," or "nonwilderness."[1] Areas marked as "wilderness" were to be recommended to Congress for inclusion into the Wilderness System, while those designated for "further planning" were to be protected until the completion of a unit management plan which considered whether to include the lands into the Wilderness System. Areas designated as "nonwilderness" were to be released for multiple use activities.

The Forest Service completed its EIS on RARE II in January, 1979. In July, 1979, the State of California brought an action challenging the Forest Service's decision to designate 47 RARE II areas in California as nonwilderness on the ground that the Final

EIS was deficient. In affirming the district court, we held the Final EIS contained an inadequate discussion of site-specific environmental consequences of the nonwilderness allocations, as well as an inadequate range of alternatives. *California v. Block,* 690 F.2d 753 (9th Cir.1982).

In response to the difficulties encountered in RARE II, Congress enacted the Oregon Wilderness Act on June 26, 1984, which added RARE II roadless areas in Oregon to the Wilderness System, and released the remaining RARE II lands to nonwilderness management. Specifically, the Act created the Sky Lakes Wilderness area from one roadless area, and assigned the Bitter Lick roadless area to "multiple use" management. The Head timber sale borders on former RARE II roadless land from which the Sky Lakes Wilderness area was created. The Ace timber sale was formerly encompassed within the Bitter Lick (RARE II) roadless area.

Corresponding legislation was enacted which annexed bordering roadless areas to Crater Lake National Park. Pub.L. No. 96–553, 94 Stat. 3255 (Dec. 19, 1980), *amended by* Pub.L. No. 97–250, 96 Stat. 709 (Sept. 8, 1982). Although previously included in roadless areas which bordered on the park, the Varmit and Butch timber sales were not annexed to the Park and were released subsequently from the inventory of roadless areas in 1981.

Prior to advertising the four timber sales, the Forest Service prepared an Environmental Assessment on each.[2] After determining

---

1. RARE II Instructions defined "roadless area" as an "area of undeveloped Federal land within which there are no improved roads maintained for travel by means of motorized vehicles intended for highway use." The Instructions required (1) the mapping and listing of all existing wilderness and primitive areas; (2) mapping and listing of the original RARE I roadless area inventory; (3) consolidation of contiguous areas in the RARE I inventory, and the addition of any areas missed; (4) the addition of areas subsequently identified as roadless through land management · planning; and (5) addition of areas designated by Congress, or by administration proposals, for wilderness study.

 Additional areas overlooked by RARE I but included in RARE II were required to (1) contain

5,000 acres or more; (2) contain less than 5,000 acres, but have characteristics making them manageable in their natural condition; or (3) be a self-contained ecosystem such as an island. The Forest Service was directed to add qualifying areas regardless of size, that are contiguous to roadless and undeveloped areas in other Federal ownership that have identified wilderness potential.

2. *See* 40 C.F.R. § 1508.9 (1992). We have described previously this process in laymen's terms:

 If an agency is unsure whether a proposed project requires an initial or supplemental EIS, federal regulations direct the agency to prepare an environmental assessment on

the timber sales did not require the preparation of an EIS, the Forest Service advertised the timber sales in late July, 1990. The four sales were offered during Fiscal Year 1990 pursuant to the terms of the Northwest Timber Compromise, as codified in § 318 of the Department of the Interior and Related Agencies Appropriations Act of 1989 (FY 1990), Pub.L. No. 101–121, 103 Stat. 745 (1989).

The Compromise established a comprehensive set of rules to govern harvesting within a geographically and temporally limited domain. By its terms, it applied only to "the thirteen national forests in Oregon and Washington and [BLM] districts in western Oregon known to contain northern spotted owls." § 318(i). It expired automatically on September 30, 1990, the last day of Fiscal Year 1990, except that timber sales offered under § 318 were to remain subject to its terms for the duration of the applicable sales contracts. § 318(k).

The Compromise both required harvesting and expanded harvesting restrictions. Subsections (a)(1) and (a)(2) required the Forest Service and the BLM respectively to offer for sale specified quantities of timber from the affected lands before the end of Fiscal Year 1990. On the other hand, subsections (b)(3) and (b)(5) prohibited harvesting altogether from various designated areas within those lands, expanding the applicable administrative prohibitions and then codifying them for the remainder of the fiscal year. In addition, subsections (b)(1), (b)(2) and (b)(4) specified general environmental criteria to govern the selection of harvesting sites by the Forest Service. Subsection (g)(1) provided

for limited, expedited judicial review of individual timber sales offered under § 318.

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, —— – ——, 112 S.Ct. 1407, 1410–11, 118 L.Ed.2d 73 (1992).

Within the fifteen-day period established by § 318(g)(1) of the Act,[3] the Audubon Society brought this action seeking to permanently enjoin the four sales until the Forest Service prepared an EIS on each. With respect to each sale, the Audubon Society argued the Forest Service failed to comply with the requirements of NEPA. Specifically, the Audubon Society complained a portion of each timber sale is roadless and undeveloped and the Forest Service is required to disclose and analyze this roadless condition in an EIS prior to selling the timber.

Prior to trial, the Forest Service made a motion in limine to restrict the district court's review to the administrative record. The district court granted this motion, but told all parties it would "receive affidavits on what the record actually included." Subsequently, the Audubon Society submitted an affidavit from Dr. Reed F. Noss, whose testimony discussed the roadless nature of the proposed timber sales and the detrimental effects a timber sale would have on these areas. Dr. Noss stated his testimony was based upon his review of the administrative record and his field review of the timber sales.

Both the Forest Service and defendant-intervenors Bill Christie, Jr. and Huffman and Wright Logging Co. ("Christie") moved the court for summary judgment. The court

which it may then base its decision. *See* 40 C.F.R. § 1501.4(b)–(c). The role of the EA is thus to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9.
*Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417, 1421–22 (9th Cir.1989) (footnote omitted), *amended*, 899 F.2d 1565 (9th Cir.1990).

3. Section 318(g)(1) provides:

No restraining order or preliminary injunction shall be issued by any court of the United States with respect to any decision to prepare, advertise, offer, award, or operate a timber

sale or timber sales in fiscal year 1990 from the thirteen national forests in Oregon and Washington.... The provisions of section 705 of title 5, United States Code, shall not apply to any challenge to such a timber sale: *Provided,* That the courts shall have authority to enjoin permanently, order modifications of, or void an individual sale if it has been determined by a trial on the merits that the decision to prepare, advertise, offer, award, or operate such sale was arbitrary, capricious or otherwise not in accordance with law: *Provided further,* That any challenge to a timber sale must be filed in Federal District Court within fifteen days of the date of initial advertisement of the challenged timber sale....

denied the motions for summary judgment and, having reviewed the administrative record under a "reasonableness" standard, concluded the Forest Service's failure to prepare an EIS was unreasonable. The district court also rejected the Forest Service's argument that the Audubon Society's challenge was barred by the Oregon Wilderness Act. The district court then entered an order permanently enjoining the four timber sales until the Forest Service completed an EIS on each. From this decision, the Forest Service and Christie appeal.

## II

### OREGON WILDERNESS ACT

█ Both the Forest Service and Christie argue Congress has precluded further judicial review of roadless area determinations, at least until second generation forest plans are revised, through the Oregon Wilderness Act, Pub.L. No. 98–328, 98 Stat. 272 (1984) ("OWA"), and the National Forest Management Act, 16 U.S.C. § 1600 et seq. (1988) ("NFMA"). This preclusion, appellants argue, allows the Forest Service to proceed with the four timber sales without first preparing an EIS on each one. We review this question of law de novo. *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

In support of its contention, the Forest Service cites language from the OWA:

On the basis of [RARE II], the Congress hereby determines and directs that—

(1) without passing on the question of the legal and factual sufficiency of the RARE II final environmental statement ... with respect to national forest lands in States other than Oregon, such statement shall not be subject to judicial review with respect to National Forest System lands in the State of Oregon;

(2) that review and evaluation or reference shall be deemed for the purpose of the initial land management plans required for such lands ... to be an adequate consideration of the suitability of such lands for inclusion in the National Wilderness Preservation System ...;

(3) areas in the State of Oregon reviewed in such final environmental statement ... and not designated as wilderness ... shall be managed for multiple use ..., Provided, That such areas need not be managed for the purpose of protecting their suitability for wilderness designation prior to or during revision of the land management plans....

Pub.L. 98–328, § 7(b)(1)–(3), 98 Stat. 272, 278 (1984). This language, the Forest Service argues, "declares the RARE II determinations are not subject to judicial review or revision for purposes of NEPA, that RARE II constitutes the necessary evaluation of roadless and undeveloped areas for first generation forest plans, and that roadless areas shall be reviewed again only in conjunction with future 10–15 year forest plan revisions. RARE II roadless determinations, then, are to remain valid, at a minimum, through the life of the first generation forest plans."

We are mindful that "judicial review of a final agency action will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Lab. v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). In this case, we conclude neither the language nor the prior judicial interpretation of the OWA supports the conclusion that Congress intended to prohibit judicial review of the Forest Service action challenged by the Audubon Society. The prohibition on judicial review found in § 7(b) of the OWA applies not to *roadless or roaded* determinations, but to the Act's *wilderness or nonwilderness* designations. The express purposes of the Act are both to "designate certain National Forest System lands ... as components of the National Wilderness Preservation System, in order to promote, perpetuate, and preserve the wilderness character of the lands," and to "insure that certain other National Forest System lands in the State of Oregon be available for nonwilderness multiple use." Pub.L. No. 98–328, § 2(b)(1) & (2), 98 Stat. 272 (1984). Further, the Act provides that review of the *wilderness* option, and not of the *roadless* option, is "not ... required ... prior to the revision of the plans." *Id.* § 7(b)(2), 98 Stat. at 278. Finally, the Act

commands "[t]hat such areas need not be managed for the purpose of protecting their suitability for wilderness designation prior to or during revision of the land management plans." *Id.* § 7(b)(3), 98 Stat. at 278.

Moreover, we previously held "[t]he RARE II EIS addresses only the environmental impact of allocating certain lands to *wilderness* status." *City of Tenakee Springs v. Block,* 778 F.2d 1402, 1405 (9th Cir.1985) (emphasis in original). In *Tenakee Springs,* we addressed this same argument in the context of the Alaska National Interest Lands Conservation Act, Pub.L. No. 90–487, 94 Stat. 2371, 2421 (1980) ("ANILCA"), legislation similar to the OWA in both purpose and language. The judicial review prohibition found in the ANILCA, in fact, was identical to § 7(b)(1) in the OWA. We noted: "The language of the remaining three subsections of § 708(b) [containing language similar to § 7(b) of the OWA] shows that § 708(b)(1) immunizes from judicial review only the wilderness/non-wilderness allocations made by RARE II and not the detailed ... allocations of nonwilderness areas [into further development categories]." *Id.*

Appellants fail to distinguish *Tenakee Springs.* Although there is different language in the OWA not found in the ANILCA, that language does not change the effect of the judicial review section. *Compare* OWA, Pub.L. 98–328 § 7(b)(2)–(3), 98 Stat. at 278, *with* ANILCA, Pub.L. No. 96–487, § 708(b)(2)–(3), 94 Stat. at 2421. By enacting the language in question, Congress sought to insure that further study of these lands for possible wilderness designation would not be conducted again during development of the first generational plan. The desire of Congress to preclude further review of wilderness designations made by the OWA and RARE II does not persuade us that Congress also intended to preclude judicial review of Forest Service compliance with NEPA in these four contested timber sales.[4]

### III

### *STANDARD OF REVIEW*

■ Christie argues the district court erred in reviewing the agency's action under the reasonableness standard. We agree, but for reasons different than those presented by the parties.[5]

The district court in the instant case noted "[t]he parties have stipulated that the provisions of § 318 of the Department of the Interior and Related Agencies Appropriations Act of 1989 (FY 1990), Pub.L. No. 101–121, 103 Stat. 701, apply to this case...." Although it recited § 318(g)(1), which requires judicial review be conducted under the arbitrary and capricious standard, the district court nevertheless applied the reasonableness standard normally applied by courts in the Ninth Circuit when reviewing an agency's decision not to prepare an EIS.[6] *See*

---

4. Christie also argues § 1604(c) of NFMA, like the OWA, precludes the necessity of an EIS for the timber sales. We previously rejected this argument in *California v. Block,* 690 F.2d 753, 775 (9th Cir.1982) ("Section 1604(c) does authorize continued management under plans predating NFMA, but the section does not speak to whether NEPA's requirements can be disregarded.").

5. Christie contends the Supreme Court's holding in *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), requires the district court to review the decision by the Forest Service not to prepare an EIS under "the deferential arbitrary and capricious standard" of § 10(a) of the Administrative Procedures Act (APA), 5 U.S.C. § 706. *Id.* at 6 (citing *Marsh,* 490 U.S. at 376, 109 S.Ct. at 1860). Christie's argument appears correct under our recent decision in *Greenpeace Action v. Franklin,* 14 F.3d 1324 (9th Cir.1992). There, as in the instant case, the agency's decision not to

prepare an initial EIS followed the preparation of an environmental assessment. In that situation, "review of an agency's determination not to prepare an initial EIS, made after considerable agency review of a project's environmental impact, is governed by the arbitrary and capricious standard." *Id.* at 1331.

This case, however, differs from *Greenpeace* and other cases involving challenges to an agency's decision not to prepare an EIS. Here, the application of the arbitrary and capricious standard of review is required not by case law but by § 318. Therefore, even though we reach the same result, here we address only the narrow question of the appropriate standard of review under § 318.

6. Even if § 318 did not apply to this case, the district court still must apply the arbitrary and capricious standard of review under *Greenpeace Action v. Franklin,* 14 F.3d 1324 (9th Cir.1992). *See, supra,* note 5.

*Seattle Community Council Fed'n v. FAA,* 961 F.2d 829, 832 (9th Cir.1992). At the time of the district court's decision, however, judicial interpretation of § 318 was limited. Subsequent decisions in cases involving § 318 now provide us guidance unavailable to the district court when it made its ruling.

In our first confrontation with § 318, we held the first sentence of § 318(b)(6)(A) [7] unconstitutional as a violation of the doctrine of separation of powers. *Seattle Audubon Soc'y v. Robertson,* 914 F.2d 1311, 1317 (9th Cir.1990), *rev'd,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). There, we found the

> language of section 318 is clear: Congress not only legislated a forest management plan, §§ 318(b)(3), (b)(5), but also directed the courts to find that that plan satisfied the environmental laws underlying the ongoing litigation. § 318(b)(6)(A). In doing so, Congress did not amend or repeal laws, as it unquestionably could do, but rather prescribed a rule for the decision of a cause in a particular way, without changing the underlying laws, as it unquestionably cannot do.

*Id.* (footnote omitted). We held

> further that, even if we could interpret section 318 as a temporary repeal of the environmental laws at issue in the underlying litigation, then section 318 would amount to an implied partial repeal of the environmental statutes [and] [t]hat is what we held … Congress could not do in an appropriations measure.

*Id.*

In a later opinion in the same action, we discussed some potential effects of our holding, with emphasis on the effect of the judicial review provisions of § 318(g)(1):

> Congress clearly intended the fifteen-day limitations period [found in subsection (g)(1) ] to apply to challenges that asserted that a Fiscal Year 1990 timber sale violated provisions of section 318. For example, subsection (g) provides only fifteen days to file a claim alleging that a proposed sale violates 318(b)(1) by failing to minimize fragmentation of old-growth forest. It is not so clear, however, that Congress intended subsection (g) to apply to claims based on the National Environmental Policy Act, the National Forest Management Act, or the Migratory Bird Treaty Act. By enacting the unconstitutional subsection (b)(6)(A), Congress apparently intended to bar altogether any claims based on these three statutes. In our earlier decision, we declined to give effect to that intent, and we made it clear that plaintiffs are entitled to pursue their claims under these three statutes. *See Seattle Audubon Soc'y v. Robertson,* 914 F.2d 1311 (9th Cir.1990). We have not yet had to decide whether our earlier decision affects the scope of what is otherwise the plain language of subsection (g). Nor do we decide that question today.

*Seattle Audubon Soc'y v. Robertson,* 931 F.2d 590, 595 n. 8 (9th Cir.1991), *rev'd,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992).

Our question concerning the impact of the judicial review provisions of § 318(g), left unanswered in the *Seattle Audubon Soc'y* opinions, was answered by the Supreme Court in *Robertson v. Seattle Audubon Soc'y,*

---

7. Section 318(b)(6)(A) provides:

Without passing on the legal and factual adequacy of the Final Supplement to the Environmental Impact Statement for an Amendment to the Pacific Northwest Regional Guide—Spotted Owl Guidelines and the accompanying Record of Decision issued by the Forest Service on December 8, 1988 or the December 22, 1987 agreement between the Bureau of Land Management and the Oregon Department of Fish and Wildlife for management of the spotted owl, the Congress hereby determines and directs that management of areas according to subsections (b)(3) and (b)(5) of this section on the thirteen national forests in Oregon and Washington and Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases captioned Seattle Audubon Society et al., v. F. Dale Robertson, Civil No. 89–160 and Washington Contract Loggers Assoc. et al., v. F. Dale Robertson, Civil No. 89–99 (order granting preliminary injunction) and the case Portland Audubon Society et al., v. Manuel Lujan, Jr., Civil No. 87–1160–FR. The guidelines adopted by subsections (b)(3) and (b)(5) of this section shall not be subject to judicial review by any court of the United States.

503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992) ("*Robertson*"). There, the Court reversed our holding in *Seattle Audubon Soc'y v. Robertson,* 914 F.2d 1311 (9th Cir.1990), and held § 318(b)(6)(A) constitutional because it "compelled changes in law, not findings or results under old law." *Robertson,* 503 U.S. at ——, 112 S.Ct. at 1413. The Court rejected our concern about implicit repeals of laws through appropriations measures for three reasons:

> First, although repeals by implication are especially disfavored in the appropriations context, Congress nonetheless may amend substantive law in an appropriations statute, as long as it does so clearly. Second, because subsection (b)(6)(A) provided *by its terms* that compliance with certain new law constituted compliance with certain old law, the intent to modify was not only clear, but express. Third, having determined that subsection (b)(6)(A) would be unconstitutional unless it modified previously existing law, the court then became obliged to impose that "saving interpretation" as long as it was a "possible" one.

*Id.* at ——, 112 S.Ct. at 1414 (citations omitted).

The Court then explained the effects of § 318 on the environmental laws for timber sales in Fiscal Year 1990:

> We describe the operation of subsection (b)(6)(A) by example. The plaintiffs in both cases alleged violations of [the Migratory Bird Treaty Act] § 2, 16 U.S.C. § 703, which makes it unlawful to "kill" or "take" any "migratory bird." Before the [Northwest Timber] Compromise was enacted [through section 318], the courts adjudicating these MBTA claims were obliged to determine whether the challenged harvesting would "kill" or "take" any northern spotted owl, within the meaning of § 2. Subsection (b)(6)(A), however, raised the question whether the harvesting would violate different prohibitions—those described in subsections (b)(3) and (b)(5). If not, then the harvesting would constitute "management ... according to" subsections (b)(3) and (b)(5), and would therefore be deemed to "mee[t]" MBTA § 2 regardless of whether or not it would cause an otherwise prohibited killing or taking. Thus under subsection (b)(6)(A), the agencies could satisfy their MBTA obligations in either of two ways: by managing their lands so as neither to "kill" nor "take" any northern spotted owl within the meaning of § 2, or by managing their lands so as not to violate the prohibitions of subsections (b)(3) and (b)(5).

*Id.* at ——, 112 S.Ct. at 1413 (footnote omitted). The Court concluded "[s]ubsection (b)(6)(A) operated identically as well upon all provisions of NEPA, NFMA, [the Federal Land Policy and Management Act of 1976], and [the Oregon–California Railroad Land Grant Act] that formed 'the basis for' the original lawsuits." *Id.*

Under *Robertson,* then, we must apply § 318, including the arbitrary and capricious standard of review found in § 318(g)(1), when reviewing the Forest Service's decision to offer the four timber sales challenged in this case. At bottom, in "challenges to sales offered during Fiscal Year 1990, subsection (g)(1) expressly provided for *judicial* determination of the lawfulness of those sales." *Id.* Subsection (g)(1) allows the district court to permanently enjoin "an individual sale if it has been determined by a trial on the merits that the decision to prepare, advertise, offer, award, or operate such sale was arbitrary, capricious or otherwise not in accordance with law...." § 318(g)(1), 103 Stat. at 749. The district court, therefore, erred when it applied a reasonableness standard.

■ In anticipation of this conclusion, the Audubon Society argues remand is unnecessary because there is little difference between the reasonableness standard and the arbitrary and capricious standard. We reject this argument for two reasons. First, in the Ninth Circuit, the 'reasonableness' and 'arbitrary and capricious' standards are not functionally equivalent: "The reasonableness standard involves less deference to the agency than does the arbitrary and capricious standard.... A finding that the agency's decision meets the more rigorous reasonableness standard thus necessitates the conclusion that the agency decision was not arbitrary and capricious." *Oregon Natural Re-*

sources Council v. Lyng, 882 F.2d 1417, 1423 (9th Cir.1989), amended, 899 F.2d 1565 (9th Cir.1990). Conversely, a finding that the agency's decision was not reasonable does not necessitate the conclusion that the decision was arbitrary and capricious.

■ Second, and more important, remand is necessary here because Robertson requires the district court to examine the Forest Service's actions under the applicable laws, including NEPA, as amended by § 318. Under § 318, then, the Forest Service may satisfy the requirements of NEPA in one of two ways. In one approach, the Forest Service may follow the normal statutory procedures required by NEPA. This option requires the Forest Service to prepare an EIS for each timber sale if, on remand, the district court determines the Forest Service's decision not to prepare an EIS was arbitrary and capricious.

In the alternative, the district court may not have to address the NEPA issue at all. Instead, under Robertson, the district court may determine the Forest Service has satisfied these same NEPA requirements by "managing their lands so as to not violate the prohibitions of subsections (b)(3) and (b)(5)."[8] Robertson, 503 U.S. at ——, 112 S.Ct. at 1413. In the language used by the Supreme Court, if the district court determines the timber sales do not violate §§ 318(b)(3) & (5), then "the harvesting [without first preparing an EIS] would ... be deemed to 'meet' [the requirements of NEPA] regardless of whether or not it would cause an otherwise prohibited [major federal

action significantly affecting the quality of the human environment]." Id. If the Forest Service chooses to pursue this tack, the district court need not be concerned about the "roadless" or "roaded" nature of the timber sales.

Therefore, we reverse the decision in the instant case and remand for review of the agency's action under the arbitrary and capricious standard from § 318(g)(1) as mandated by the Supreme Court in Robertson.

## IV

### SCOPE OF REVIEW

■ Appellants argue the district court improperly relied upon Dr. Noss's testimony when it found the sales involve roadless and undeveloped areas, the presence of such areas mandate the preparation of an EIS, and a permanent injunction is appropriate until an EIS is prepared. Whether the district court exceeded its proper scope of review of the administrative record is a question of law we review de novo. McConney, 728 F.2d at 1201. In reviewing decisions of the district court, we may affirm on any ground supported by the record. Marino v. Vasquez, 812 F.2d 499, 508 (9th Cir.1987).

Based on the record, the district court apparently considered Dr. Noss's affidavit in reaching its decision. The court's opinion not only quoted the affidavit, but also enjoined only those harvest units designated by the affidavit as objectionable. The district court, however, did not indicate its reasons

---

8. Section 318(b) provides:

(3) No timber sales offered pursuant to this section from the thirteen national forests in Oregon and Washington known to contain northern spotted owls may occur within [Spotted Owl Habitat Areas] identified pursuant to the Final Supplement to the Environmental Impact Statement for an Amendment to the Pacific Northwest Regional Guide—Spotted Owl and the accompanying Record of Decision issued by the Forest Service on December 8, 1988 as adjusted by this subsection:

....

(C) For the Oregon Cascades Province, which includes the Mt. Hood, Willamette, Rogue River, Deschutes, Winema, and Umphqua National Forest, SOHA size is to be 1,875 acres;

....

(5) No timber sales offered pursuant to this section on Bureau of Land Management lands in western Oregon known to contain northern spotted owls shall occur within the 110 areas identified in the December 22, 1987 agreement, except sales identified in said agreement, between the Bureau of Land Management and the Oregon Department of Fish and Wildlife. Not later than thirty days after enactment of this Act, the Bureau of Land Management, after consulting with the Oregon Department of Fish and Wildlife Service to identify high priority spotted owl area sites, shall select an additional twelve spotted owl habitat areas. No timber sales may be offered in the areas identified pursuant to this subsection during fiscal year 1990.

for considering this evidence, which was not included in the record.

When reviewing an agency action, the district court "will engage in a substantial inquiry, but it must not substitute its own judgment for that of the Agency." *Abramowitz v. United States EPA*, 832 F.2d 1071, 1075 (9th Cir.1987). In most cases, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). "This standard of review is applicable to review of agency action under NEPA." *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988), *amended*, 867 F.2d 1244 (9th Cir.1989).

"However, certain circumstances may justify expanding review beyond the record or permitting discovery." *Id.* For example, "an allegation that an EIS has failed to mention a serious environmental consequence may be sufficient to permit the introduction of new evidence outside of the administrative record...." *Id.* at 1437 (citing *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368, 1384–85 (2d Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978)). In that case, we explained:

the district court may extend its review beyond the administrative record and permit the introduction of new evidence in NEPA cases where the plaintiff alleges "that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug."

*Id.* (quoting *County of Suffolk*, 562 F.2d at 1384–85 (citations omitted)). We discussed this exception in *Animal Defense Council* but found the exception inapplicable on the facts. *Id.*

 Moreover, review of matters beyond the administrative record may be appropriate where special review procedures are prescribed by Congress. *See Public Power Council v. Johnson*, 674 F.2d 791, 794–95 (9th Cir.1982). In *Johnson*, the court had original jurisdiction under 16 U.S.C. § 839f(e)(5) (1988), which "streamlined judicial review to facilitate further the urgent reallocation of power." *Id.* at 795. There, this court allowed limited discovery of matters outside the administrative record:

We have a short period to review the merits of petitioners' claims. We must avoid any delay arising from incomplete allegations or a subsequent need to remand to the agency or to expand the record. By permitting discovery, we facilitate expeditious review of the agency's contract offers, as the merits panel will be provided with fully-developed contentions and a complete record, should it deem resort to the supplemental material appropriate for its decision. The panel on the merits is free to strike any portion of the record, but we must at this stage insure there will be a full presentation of the issues to it.

*Id.* at 795. We note, however, *Johnson* does not carve out a clear exception to the general rule. *See Nat'l Wildlife Fed'n v. Burford*, 677 F.Supp. 1445, 1457 (D.Mont.1985) ("Some caution must be taken to avoid overstating the breadth of the *Johnson* decision."), *aff'd*, 871 F.2d 849 (9th Cir.1989).[9]

 In this case, we hold the district court's consideration of Dr. Noss's affidavit

9. Courts have created several other exceptions which are not applicable in this case. For example, a court

may inquire outside the administrative record when necessary to explain the agency's action. When such a failure to explain agency action effectively frustrates judicial review, the court may "obtain from the agency, either through affidavits or testimony, such additional examination of the reasons for the agency decisions as may prove necessary." The court's inquiry outside the record is limited to determining whether the agency has considered all relevant

factors or has explained its course of conduct or grounds of decision.

*Animal Defense Council*, 840 F.2d at 1436 (quoting *Camp*, 411 U.S. at 143, 93 S.Ct. at 1244); *see also Asarco, Inc. v. United States EPA*, 616 F.2d 1153, 1160 (9th Cir.1980). Also, the district court may inquire outside the record when the agency has relied on documents not included in the administrative record, if supplementation of the record is necessary to explain technical terms or complex subject matter involved, or when plaintiffs make a showing of agency bad faith. *Animal Defense Council*, 840 F.2d at 1436–37.

may be affirmed under either *County of Suffolk* or *Johnson*. First, we conclude the exception discussed in *County of Suffolk v. Secretary of the Interior*, 562 F.2d at 1384–85 is applicable on the facts of this case. The Audubon Society alleges the Forest Service completely ignored the roadless nature of the timber sales when it prepared the environmental assessments. In its defense, the Forest Service repeats its argument that, under the OWA, it was not required to consider the roadless nature of the four timber sales. We again reject this argument, and we agree with the district court that the decision to harvest timber on a previously undeveloped tract of land is "an irreversible and irretrievable decision" which could have "serious environmental consequences." *See California v. Block,* 690 F.2d 753, 763 (9th Cir.1982). Therefore, because the Audubon Society alleged the Forest Service "neglected to mention a serious environmental consequence" in preparing the environmental assessments on the four challenged timber sales, we hold the district court properly considered Dr. Noss's affidavit even though it is not contained within the administrative record.

**■** Second, we conclude the district court properly considered matters outside the administrative record under the exception found in *Johnson*, 674 F.2d at 794–95. Certainly, § 318 does not provide the district court with specific authority to examine evidence outside the administrative record like Dr. Noss's affidavit. However, given the limited scope and applicability of § 318, especially its accelerated judicial review procedures, *see* § 318(g)(1), we believe that, ruling on a § 318 challenge, the district court must be able to examine such evidence to "insure there will be a full presentation of the issues to it." *Johnson*, 674 F.2d at 795. Therefore,

exercising caution not to overstate the *Johnson* exception, we hold the district court properly reviewed Dr. Noss's affidavit in reaching its decision in the case.

Therefore, we affirm the district court's consideration of Dr. Noss's affidavit under two exceptions to the general rule that the court's review must be limited to the administrative record.

## V

## CONCLUSION

**■** We reverse the decision imposing permanent injunctions on the Ace, Butch, Varmit, and Head timber sales, and remand the case to the district court for review of the Audubon Society's challenges under the arbitrary and capricious standard of review imposed by Congress in § 318 of the Department of the Interior and Related Agencies Appropriations Act of 1989 (FY 1990), Pub.L. No. 101–121, 103 Stat. 745 (1989). Also, we reject the Forest Service's argument that the Oregon Wilderness Act precludes judicial review of the agency's failure to prepare an EIS prior to offering the timber sales. Finally, we affirm the district court's consideration of Dr. Noss's affidavit in reaching its decision on the merits in this case.[10]

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**10.** The Audubon Society seeks attorneys' fees for this appeal pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA"). EAJA provides:

[A] court shall award to a prevailing party other than the United States fees and expenses ... incurred by that party in any civil action ... brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). The party must win some relief on the merits of his claims to be a prevailing party. *Thompson v. Dept. of Labor,* 885 F.2d 551, 558 (9th Cir.1989) (quotations omitted).

We agree with the Forest Service and Christie that the district court erred when it reviewed under the reasonableness standard the Forest Service's decision to offer the four timber sales without first preparing an EIS. Therefore, the Audubon Society is not a prevailing party and is not entitled to an award of attorneys' fees under EAJA.